**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| NUCOR CORPORATION, | |
| Plaintiff, | |
| v. | Court No. 22-00137 |
| UNITED STATES, | |
| Defendant, | |
| and | |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | |
| Defendant-Intervenor. | |

**ORDER**

Upon consideration of the plaintiff's Rule 56.2 motion for judgment on the agency record, defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the plaintiff's Rule 56.2 motion for judgment on the agency record is denied; and it is further

ORDERED that judgment shall issue for the United States.


Dated: _____          _____
      New York, New York                                           JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| NUCOR CORPORATION, | |
| Plaintiff, | |
| v. | Court No. 22-00137 |
| UNITED STATES, | |
| Defendant, | |
| and | |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | |
| Defendant-Intervenor. | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

BRIAM M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

W. MITCH PURDY
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for
Trade Enforcement & Compliance
Washington, D.C. 20230


December 15, 2022

ELIZABETH A. SPECK
Senior Trial Counsel
United States Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0369
Fax: (202) 514-7965


Attorneys for Defendant

<u>**TABLE OF CONTENTS**</u>

STATEMENT PURSUANT TO RULE 56.2 ..............................................................2

    I.  Administrative Determination Under Review ..............................................2

    II.  Issue Presented For Review ........................................................................2

STATEMENT OF FACTS .................................................................................2

SUMMARY OF ARGUMENT ..........................................................................8

ARGUMENT ....................................................................................................9

    I.  Standard Of Review ...................................................................................9

    II.  Commerce's Finding That The Provision Of Electricity For Less-Than-Adequate Remuneration Either Did Not Confer A Benefit Or Conferred A Non-Measurable Benefit Is Supported By Substantial Evidence And Is In Accordance With Law ...........10

        A.  Relevant Legal Framework...................................................................10

        B.  Commerce Reasonably Determined That The Korean Government Did Not Subsidize Hyundai Steel Or POSCO By Providing Electricity For Less-Than Adequate Remuneration......................................................12

            1.  Record Evidence Supports Commerce's Conclusion That KEPCO's Prices Were Set In Accordance With Market Principles .........................12

            2.  Nucor's View That The Government Of Korea's Pricing Data Is "Distorted" Does Not Establish That Commerce's Determination Is Unsupported By Substantial Evidence.....................................................16

        C.  Commerce's Application Of Its Tier 3 Benchmark Is In Accordance With Law ........................................................................................19

CONCLUSION.................................................................................................25

**TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Page(s)**

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) .............................................................................................. 10

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ................................................................................... 9, 16, 19

*Consolo v. Fed. Maritime Comm'n*,
    383 U.S. 607 (1966) ................................................................................... 9, 12, 19

*Corus Staal BV v. United States*,
    395 F.3d 1343 (Fed. Cir. 2005) ............................................................................. 9

*Habas Sinai v. Tibbi Gazlar Istihsal Endustrisi A.S.*,
    536 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) ...................................................... 18

*Nucor Corp. v. United States*,
    927 F.3d 1243 (Fed. Cir. 2019) ..................................................................... *passim*

*POSCO v. United States*,
    557 F. Supp. 3d 1290 (Ct. Int'l Trade 2022),
    *appeal docketed*, No. 2022-1525 (Fed. Cir. Mar. 11, 2022) .................................. 8

*POSCO v. United States*,
    977 F.3d 1369 (Fed. Cir. 2020) ..................................................................... *passim*

*POSCO v. United States*,
    CIT No. 17-00137 (Mar. 16, 2021) ................................................................ 8, 19

*Titan Tire Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009) ........................................................................... 16

*U.S. Steel Corp v. United States*,
    33 CIT 1944 (2009) .............................................................................................. 23

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014) ............................................................................................ 20

*Uttam Galva Steels Ltd. v. United States*,
    No. 21-2119, 2022 WL 1419596 (Fed. Cir. May 5, 2022) .................................. 12

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*,
    350 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ...................................................... 16

**Statutes**

19 U.S.C. § 1516(a) ................................................................................................ 9

19 U.S.C. § 1677(5) ........................................................................................ *passim*

**Regulations**

19 C.F.R. § 351.511 ........................................................................................ 10, 11

19 C.F.R. § 511(a) .......................................................................................... *passim*

**Rules**

RFCF 56.2 ...................................................................................................... 1, 2

**Federal Registar**

*Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea*,
  82 Fed. Reg. 16,341 (Dep't of Commerce April 4, 2017) (final affirmative countervailing duty
  determination and final negative critical circumstances determination) ............................ 5, 13

*Certain Cold-Rolled Steel Flat Products from Brazil, India, and the Republic of Korea*,
  81 Fed. Reg. 64,436 (Dep't Commerce Sept. 20, 2016) ........................................................... 2

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
  86 Fed. Reg. 55,572 (Dep't Commerce Oct. 6, 2021), P.R. 175 ................................................ 3

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
  87 Fed. Reg. 20,821 (Dep't Commerce Apr. 8, 2022) (final results of countervailing duty
  administrative review) ...................................................................................... *passim*

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
  87 Fed. Red. 24,095 (Dep't Commerce Apr. 22, 2022) (final results of countervailing duty
  administrative review; correction) ............................................................................ 2

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea 2017*, 85 Fed. Reg. 38,361
  (Dep't of Commerce June 26, 2020) (final results of countervailing duty admin. review)...... 22

*Certain Corrosion Resistant Steel Products from the Republic of Korea,*
81 Fed. Reg. 35,310 (Dep't of Commerce June 2, 2016) (final determ.) .................................. 6

*Certain Corrosion-Resistant Steel Products from the Republic of* Korea,
85 Fed. Reg. 15, 112 (Dep't of Commerce Mar. 17, 2020) (final results of countervailing duty administrative review) ...................................................................................................... 6, 13

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea,*
81 Fed. Reg. 4,996 (Dep't of Commerce Jul. 29, 2016) (final determ.)................................... 6

*Circular Welded Carbon Quality Steel Pipe from the People's Republic of China,*
73 Fed. Reg. 31,966 (Dep't of Commerce June 5, 2008) (final affirmative countervailing duty determ. and final affirmative determination of critical circumstances)................................... 23

*Countervailing Duties: Final Rule,*
63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998)...................................................... 11

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
85 Fed. Reg. 41,540 (Dep't of Commerce July 10, 2020)......................................................... 3

*Light-Walled Rectangular Pipe & Tube from the People's Republic of China,*
73 Fed. Reg. 35,642 (Dep't of Commerce June 24, 2008) (final affirm. countervailing duty investigation determ.) ............................................................................................................. 23

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea,*
86 Fed. Reg. 35,267 (Dep't of Commerce July 2, 2021) (final determ.)........................... 14, 17

*Welded Line Pipe from the Republic of Korea,*
80 Fed. Reg. 61,365 (Dep't of Commerce Oct. 13, 2015) (final determ.)................................. 6

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| NUCOR CORPORATION, | |
| Plaintiff, | |
| v. | Court No. 22-00137 |
| UNITED STATES, | |
| Defendant, | |
| and | |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | |
| Defendant-Intervenor. | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully responds to the motion for judgment upon the agency record filed by plaintiff Nucor Corporation (Nucor), a domestic producer of certain cold-rolled steel flat products (CRS).  In its motion, Nucor challenges the Department of Commerce's (Commerce) final results of its countervailing duty administrative review regarding the government of the Republic of Korea's (GOK or Korean government) supply of electricity to Korean CRS producers.  As demonstrated below, Nucor's motion should be denied because Commerce's determination that the Korean government's provision of electricity for less than adequate remuneration (LTAR) resulted in either no benefit or a non-measurable benefit to respondents POSCO and Hyundai Steel

Company (Hyundai Steel) is supported by substantial evidence and is otherwise in accordance with law.

**STATEMENT PURSUANT TO RULE 56.2**

I.    <u>**Administrative Determination Under Review**</u>

The administrative determination under review is *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 87 Fed. Reg. 20,821 (Dep't of Commerce Apr. 8, 2022) (final results of countervailing duty administrative review) (*Final Results*), ECF No. 19-4,[1] and accompanying Issues and Decision Memorandum (IDM), ECF No. 19-6. *See also Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 87 Fed. Red. 24,095 (Dep't of Commerce Apr. 22, 2022) (final results of countervailing duty administrative review; correction), ECF No. 19-5. The period of review (POR) is January 1, 2019, through December 31, 2019.

II.   <u>**Issue Presented For Review**</u>

Whether Commerce's determination that the government of Korea's provision of electricity to certain CRS manufacturers either resulted in no benefit or in a non-measurable benefit is supported by substantial evidence and is otherwise in accordance with law.

**STATEMENT OF FACTS**

On September 20, 2016, Commerce published the countervailing duty order that applies to this review. *Certain Cold-Rolled Steel Flat Products from Brazil, India, and the Republic of Korea*, 81 Fed. Reg. 64,436 (Dep't of Commerce Sept. 20, 2016) (*CRS Order*). On October 30, 2020, Commerce initiated the administrative review covering the period of review of January 1,

---

[1] Documents contained in the administrative record are identified by the name and the date of the documents, followed by a confidential record (C.R.) and public record (P.R.) numbers assigned to these documents in the respective administrative indices filed with the court on April 27, 2022.

2019 to December 31, 2019.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 41,540, 41,548 (Dep't of Commerce July 10, 2020).

In December 2020, Commerce selected Hyundai Steel and POSCO as the mandatory respondents for this administrative review.  *See Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 86 Fed. Reg. 55,572 (Dep't of Commerce Oct. 6, 2021), P.R. 175 (*Preliminary Results*) and accompanying Issues and Decision Memorandum, P.R. 169 (PDM) at 2.

On February 24, 2021, the petitioners, AK Steel Corporation, Steel Dynamics Inc., Nucor Corporation (Nucor), and United States Steel Corporation, submitted timely new subsidy allegations (NSA), including a new subsidy allegation that Korean CRS producers benefitted from unfairly subsidized electricity during the period of review.  PDM, P.R. 169 at 3; Petitioners' New Subsidy Allegation, Nov. 19, 2020, P.R. 83-84.  Commerce subsequently initiated an NSA review of electricity for less-than-adequate remuneration (LTAR).  PDM, P.R. 169 at 3 (citing Memorandum, "New Subsidy Allegation," (NSA Memorandum) Mar. 12, 2021, P.R. 107).

On October 6, 2021, Commerce issued its preliminary results, preliminarily determining that Hyundai Steel and POSCO received *de minimis* subsidy rates.  *Preliminary Results*, 86 Fed. Reg. at 55,572, P.R. 175, and PDM, P.R. 169.  In its preliminary results, after examining the statutory requirements for countervailable programs, Commerce found the state-owned Korea Electric Power Corporation (KEPCO) to be an "authority" that provides a "financial contribution" in the form of a good or service to CRS producers pursuant to 19 U.S.C. § 1677(5)(D)(iii).  PDM, P.R. 169 at 34 (citing POSCO NSA Questionnaire Response (POSCO NSA QR), Mar. 30, 2021, P.R.123, C.R. 266-267 at 1; Hyundai Steel NSA Questionnaire

Response (Hyundai NSA QR), Mar. 23, 2021, P.R. 120, C.R. 249-251 at 1; Government of Korea NSA Questionnaire Response (GOK NSA QR), Mar. 23, 2021, P.R. 121-122, C.R. 252-259 at Exh. E-1 at 4-7, 30-32, F-82, F-86, and F-98 and Appendix-1 at 4).  But Commerce further determined that the financial contribution did not amount to a "benefit conferred" pursuant to section 1677(5)(E)(iv) because the electricity was not provided for "less than adequate remuneration," or that the price for electricity resulted in a "non-measurable" benefit during the period or review.  PDM, P.R. 169 at 38-39 (citing Hyundai Preliminary Calc. Memo., Oct. 1, 2021, P.R. 170, C.R. 312-313; POSCO Prelim. Calc. Memo, Oct. 1, 2021, P.R. 171-172, C.R. 314-316); *see also* Hyundai NSA QR, C.R. 249-251 at Exh. NSA-2; POSCO NSA QR, C.R. 266-267 at Exh. NSA-2.

In its preliminary results, Commerce first analyzed KEPCO's supply of electricity to the Korean steel industry and to producers of cold-rolled steel.  PDM, P.R. 169 at 34-35 (citing GOK NSA QR, C.R. 252-259 at 2-8, 27-30, Exh. E-1 at 30-32, F-82, F-86, F-98, Exhs. E-6, E-7, E-8, and E-9; NSA Memorandum, P.R. 107; POSCO NSA QR, C.R. 266-267 at 1; Hyundai NSA QR C.R. 249-251 at 1).  Commerce found that KEPCO is the primary utility company in Korea providing electricity to Korean consumers and also that the Korean government regulates the rates that KEPCO charges for electricity.  PDM, P.R. 169 at 34-35 (citing GOK NSA QR, C.R. 252-259 at 4-7, Appendix-1 at 4, Exh. E-1 at 30-32).  Accordingly, Commerce explained that, pursuant to the statutory definition, found in 19 U.S.C. § 1677(5), KEPCO is an "'authority'" that provided a 'financial contribution' in the form of a good or service under {19 U.S.C. § 1677(5)(D)(iii)}" to producers of CRS from Korea.  PDM, P.R. 169 at 34 (citing GOK NSA QR, C.R. 252-259 at 4-7).

After determining that the Korean government provided a "financial contribution," for purposes of 19 U.S.C. § 1677(5)(D)(iii), Commerce next analyzed whether the government's supply of electricity to CRS producers amounted to a "benefit conferred" under 19 U.S.C. § 1677(5)(E). PDM, P.R. 169 at 34-39. To determine if the Korean government's supply of electricity constituted a subsidy, Commerce applied the three-tiered benchmark framework outlined in 19 C.F.R. § 351.511(a)(2)(i)-(iii). *Id.* at 35-36.

Commerce determined that it could not apply the tier 1 or the tier 2 benchmarks, established in 19 C.F.R. §§ 351.511(a)(2)(i)-(ii), and no party challenges this aspect of Commerce's analysis. PDM, P.R. 169 at 34-35. Turning to the tier 3 benchmark, 19 C.F.R. § 351.511(a)(2)(iii), which evaluates whether the "government price is consistent with market principles," Commerce determined that it could analyze Korean electricity prices using this benchmark, because KEPCO adhered to its standard price-setting philosophy and charged Hyundai Steel and POSCO the rates from the tariff schedule applicable to all industrial users. *Id.* at 36-37 (citing GOK NSA QR, C.R. 252-259 at 22-23, Exhs. E-7, E-8, E-13 through E-19); *see also* IDM, ECF No. 19-6 at 21.

In conducting the tier 3 benchmark analysis, Commerce analyzed whether electricity was provided for "adequa{te} remuneration" for purposes of 19 C.F.R. § 351.511(a)(2)(iii), by assessing whether the government price for electricity in Korea is consistent with market principles. *See* PDM, P.R. 169, at 35. Commerce explained that the applicable tariff schedule in effect during the period of review came into effect in November 2013 and that Commerce had previously evaluated the process and methodology to develop and approve that tariff schedule and "determined it was set according to market principles." PDM, P.R. 169 at 36 (citing *Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea*, 82 Fed. Reg. 16,341

(Dep't of Commerce April 4, 2017) (final affirmative countervailing duty determination and final negative critical circumstances determination) (*CTL Plate from Korea*), and accompanying IDM at cmt. 2; *Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 4,9946 (Dep't of Commerce Jul. 29, 2016) (final determ.), and accompanying IDM at cmt. 2; *Certain Corrosion Resistant Steel Products from the Republic of Korea*, 81 Fed. Reg. 35,310 (Dep't of Commerce June 2, 2016) (final determ.), and accompanying IDM at cmt. 2; *Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 61,365 (Dep't of Commerce Oct. 13, 2015) (final determ.), and accompanying IDM at cmt. 1).  Specifically, Commerce had determined that "GOK had a pricing methodology in place and that it considered costs and a return on investment."  PDM, P.R. 169 at 36.  And based on information the government of Korea placed on the record, Commerce concluded that there were no changes from these prior findings and turned to whether KEPCO recovered its costs, including rates of return sufficient to ensure future operations, for the period of review.  *Id.* (citing GOK NSA QR, C.R. 252-259 at 22-23 Exhs. E-7, E-8, E-13 through E-19).

In doing so, Commerce first analyzed the process set by the Korea Power Exchange (KPX), the entity that sells electricity to KEPCO and owns six subsidiary generators (GENCOs). PDM, P.R. 169 at 36-37.  Commerce explained that in recent reviews it had analyzed KPX's prices in the context of an upstream subsidy allegation and had found no benefit.  PDM, P.R. 169 at 36-37 (citing, *e.g.*, *Certain Corrosion-Resistant Steel Products from the Republic of* Korea, 85 Fed. Reg. 15,112 (Dep't of Commerce Mar. 17, 2020) (final results of countervailing duty administrative review) (*CORE Second Admin. Review*), and accompanying IDM at cmt. 1). Commerce also explained that in other reviews, the government of Korea had provided financial statements for the GENCOs and Commerce had concluded that each of the six GENCOs had

recovered its costs. PDM, P.R. 169 at 37 (citing GOK Fourth NSA Supplemental Questionnaire Response (GOK NSA SR4), July 14, 2021, P.R. 141-143, C.R. 282-284 at 2-3, Exh. E-27.1; GOK NSA QR, C.R. 252-259 at 2-8, 27-30, Exhs. E-6 through E-9). Thus, Commerce concluded that "the price paid by KEPCO through KPX is inclusive of a rate of return." PDM, P.R. 169 at 37.

Commerce then analyzed KEPCO's 2019 costs as reported to the Korean Ministry of Trade, Industry, and Energy (MOTIE) and supporting documentation as well as Hyundai Steel's and POSCO's electricity usage data. PDM, P.R. 169 at 37-38 (citing GOK NSA QR, C.R. 252-259 at 1-3, 8-17, Exh. E-5 at 3-4, Exh. E-17; GOK NSA Second Supplemental Questionnaire Response (GOK NSA SR2), April 23, 2021, P.R. 129, C.R. 274-275 at 1-6; Hyundai Prelim. Calc. Memo, C.R. 312-313; POSCO Prelim. Calc. Memo., C.R. 314-316; Hyundai NSA QR, C.R. 249-251 at Exh. NSA-2; POSCO NSA QR, C.R. 266-267 at Exh. NSA-2). Commerce also compared the companies' reported industrial tariff rates to KEPCO's cost data and determined that "certain reported industrial rates recovered costs at a rate of return and certain rates did not recover costs at a rate of return." PDM, P.R. 169 at 38 (citing POSCO Prelim. Calc. Memo., C.R. 314-316; Hyundai NSA QR, C.R. 249-251 at Exh. NSA-2). Thus, Commerce preliminarily concluded that KEPCO has a pricing mechanism in place that is based on market principles but that "the industrial rates did not always recover costs and a rate of return" under the tier 3 analysis. PDM, P.R. 169 at 38. After conducting a further analysis, however, Commerce concluded that any benefit that was provided to Hyundai Steel and POSCO under those

categories was "non-measurable". *Id.* at 39. Accordingly, Commerce preliminarily determined that the supply of electricity did not constitute a "benefit conferred" as defined by 19 U.S.C. § 1677(5)(E), or alternatively, that any benefit was non-measurable. PDM, P.R. 169 at 39.

Commerce issued its *Final Results* on April 8, 2022. *Final Results*, 87 Fed. Reg. at 20,821. In its IDM, Commerce explained that its conclusions about the provision of electricity for less than adequate remuneration were unchanged from the preliminary results. IDM, ECF No. 19-6 at 20-25 (citing PDM, P.R. 169 at 33, 38-39; GOK NSA QR, C.R. 252-259 at 30-31, Exh. E-9; Hyundai NSA QR, C.R. 249-251 at Exhs. NSA-2 and NSA-3; POSCO NSA QR, C.R. 266-267 at Exhs. NSA-2 and NSA-3). In doing so, Commerce rejected Nucor's arguments that it: (1) had not adequately considered whether KEPCO's electricity tariffs allowed for the recovery of costs plus a rate of recovery or profit; (2) had acted inconsistently with its remand redetermination in *POSCO v. United States*, CIT No. 17-00137 (Mar. 16, 2021); and (3) incorrectly focused upon the financial performance of KEPCO or the government supplier's total revenue rather than the prices paid by the respondents. IDM, ECF No. 19-6 at 16-17, 20-25.[2] This appeal followed.

## SUMMARY OF ARGUMENT

Commerce's determination that the government of Korea does not provide electricity for less-than-adequate remuneration is supported by substantial evidence and is otherwise in accordance with law. Commerce undertook a less-than-adequate remuneration analysis, examining whether the government of Korea sets its tariffs in accordance with market principles. The government of Korea's NSA and supplemental questionnaire responses indicate that

---

[2] The Court of International Trade sustained Commerce's determination on remand in *POSCO v. United States*, 557 F. Supp. 3d 1290 (Ct. Int'l Trade 2022), *appeal docketed*, No. 2022-1525 (Fed. Cir. Mar. 11, 2022).

KEPCO fully recovered its costs, plus a rate of recovery or profit. Commerce's examination of KPX shows that generators are paid their costs as well as a return on investment. And to the extent that the industrial rates paid by the respondents did not cover costs and a rate of return, Commerce reasonably concluded that it resulted in a "non-measurable benefit." PDM, P.R. 169 at 39. Commerce's determination is supported by substantial evidence.

Nucor contends that Commerce unlawfully limited its analysis to the "aggregate" performance of KEPCO rather than the prices "actually paid" by Hyundai Steel and POSCO. Nucor Br. at 2. But the nature of a tier 3 analysis means that Commerce does not have the benefit of market-derived or world market prices for comparison, and thus the fundamentals of the program at issue necessarily must be examined to determine if it operates in accordance with market principles. Accordingly, Commerce's determination is supported by substantial evidence, in accordance with law, and should be sustained.

## **ARGUMENT**

### I.    **Standard Of Review**

This Court sustains any determination, finding, or conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law{.}" *Corus Staal BV v. United States*, 395 F.3d 1343, 1346 (Fed. Cir. 2005) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citation omitted). Even if it is possible to draw two inconsistent conclusions from the record evidence, this does not mean that Commerce's findings are unsupported by substantial evidence. *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

**II.** **Commerce's Finding That The Provision Of Electricity For Less-Than-Adequate Remuneration Either Did Not Confer A Benefit Or Conferred A Non-Measurable Benefit Is Supported By Substantial Evidence And Is In Accordance With Law**

    **A.** **Relevant Legal Framework**

Commerce determines that a countervailable subsidy exists in circumstances when an "authority" provides a "financial contribution," which results in a "benefit conferred" to the recipient, and the subsidy is specific. 19 U.S.C. § 1677(5). In cases in which an authority provides a "financial contribution" for purposes of 19 U.S.C. § 1677(5)(D) through the provision of goods or services, the statute explains that a "benefit shall normally be treated as conferred" when those goods or services "are provided for less than adequate remuneration{.}" *Id.* at § 1677(5)(E)(iv). The statute further states that, when goods or services are provided for "less than adequate remuneration," the adequacy of remuneration "shall be determined in relation to prevailing market conditions for the good or service being provided" in the country which is subject to the investigation or review. *Id.* at § 1677(5)(E). Prevailing market conditions include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.*

The statute is silent as to how to measure the adequacy of remuneration in these circumstances. Thus, Commerce's interpretation governs so long as it is "based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Commerce's regulations explain how it evaluates the adequacy of remuneration in particular circumstances. *See* 19 C.F.R. § 351.511. Commerce "will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in

the country in question." *Id*. at § 351.511(a)(2)(i).  This constitutes the tier 1 benchmark.  If

market-prices are not available, Commerce measures the adequacy of remuneration "by

comparing the government price to a world market price where it is reasonable to conclude that

such price would be available to purchasers in the country in question."  *Id*. at

§ 351.511(a)(2)(ii).  This constitutes the tier 2 benchmark.  Where a tier 2 benchmark is also

unavailable, Commerce "measure{s} the adequacy of remuneration by assessing whether the

government price is consistent with market principles."  *Id*. at § 351.511(a)(2)(iii).  This

constitutes a tier 3 benchmark, which was applied in this case.

Commerce evaluates these three benchmarks in hierarchical order.  In the preamble to 19

C.F.R. § 351.511, Commerce explained that when using a tier 3 benchmark analysis, it will

examine "such factors as the government's price setting philosophy, costs (including rates of

return sufficient to ensure future operations), or possible price discrimination."  *Countervailing*

*Duties: Final Rule*, 63 Fed. Reg. 65,348, 65,378 (Dep't of Commerce Nov. 25, 1998) (*CVD*

*Preamble*).  Commerce does not consider these tier 3 factors "in any hierarchy" and "may rely

on one or more of these factors in any particular case."  *Id*.

In *Nucor Corporation v. United States*, 927 F.3d 1243, 1254-1259 (Fed. Cir. 2019), the

United States Court of Appeals for the Federal Circuit sustained Commerce's conclusion that

KEPCO did not provide electricity to CORE producers for less than adequate remuneration

under a tier 3 benchmark and upheld Commerce's finding that "KEPCO's pricing met familiar

standards of cost recovery."  *See also POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020).

In doing so, the Court explained that the tier 3 benchmark analysis "leaves {Commerce} with a

large range of potential implementation choices."  *Id.*  Also, in *Nucor*, Commerce examined

KEPCO's tariff schedule and analyzed how it calculated its overall cost, including a return on

investment. 927 F.3d at 1247. In *POSCO*, the Federal Circuit held that Commerce was required to investigate KPX's cost of electricity generation and to consider KPX's impact on the Korean electricity market. 977 F.3d at 1377.

**B.    Commerce Reasonably Determined That The Korean Government Did Not Subsidize Hyundai Steel Or POSCO By Providing Electricity For Less-Than-Adequate Remuneration**

Substantial evidence supports Commerce's conclusion that the government of Korea's supply of electricity to CRS producers either provided no benefit or a non-measurable benefit. Nucor disagrees and contends that Commerce ignored that Korean market prices are not governed by market principles, are "distorted," and do not reflect the cost of production plus an amount for profit. Nucor Br. at 19-24. Record evidence, however, supports Commerce's conclusion that electricity pricing "is based on price-setting methodologies that aim to ensure companies in the chain are able to cover their costs, as well as a rate of profit." IDM, ECF No. 19-6 at 23-24 (citing PDM, P.R. 169 at 32-39). Thus, Nucor's disagreement does not satisfy its burden of establishing the cited evidence "could lead Commerce to reach one and only one reasonable outcome on the administrative record." *Uttam Galva Steels Ltd. v. United States*, No. 21-2119, 2022 WL 1419596, at *4 (Fed. Cir. May 5, 2022); *see also Consolo*, 383 U.S. at 620 (explaining that the ability to reach an inconsistent conclusion from the record evidence does not satisfy the burden of demonstrating a decision is unsupported by substantial evidence).

**1.    Record Evidence Supports Commerce's Conclusion That KEPCO's Prices Were Set In Accordance With Market Principles**

Here, it is uncontested that KEPCO is an "authority" for purposes of 19 U.S.C. § 1677(5)(B) that provides a contribution in the form of electricity under section 19 U.S.C. § 1655(5)(D). Thus, the parties dispute only whether electricity was provided for less-than-adequate remuneration under Commerce's tier 3 benchmark analysis. Although Nucor disagrees

with Commerce's conclusion that record evidence establishes that KEPCO sets prices in accordance with market principles, Commerce identified record evidence supporting its conclusions in a manner that was sustained by the Federal Circuit in *Nucor Corp. v. United States*, 927 F.3d 1249, 1254-55, and in accordance with the Court's requirement to consider data from KPX in *POSCO*, 977 F.3d at 1377-78.

In conducting its tier 3 benchmark analysis, Commerce analyzed whether electricity was provided for "adequa{te} remuneration" for purposes of 19 C.F.R. § 511(a)(2)(iii), by assessing whether the government price for electricity in Korea is consistent with market principles. PDM, P.R. 169, at 35-36. Noting that the applicable tariff schedule in effect during the period of review came into effect in November 2013, Commerce explained that previously it had evaluated the process and underlying methodology used to develop and approve that tariff schedule and "determined it was set according to market principles." PDM, P.R. 169 at 36 (citing, *e.g.*, *CTL Plate from Korea*, 82 Fed. Reg. 16,341, and accompanying IDM at cmt. 2). And, in those cases, Commerce determined that the "GOK had a pricing methodology in place and that it considered costs and a return on investment." PDM, P.R. 169 at 36. Analyzing record evidence submitted by the government of Korea, Commerce concluded that there were no changes from these prior findings and turned to whether KEPCO recovered its costs, including rates of return sufficient to ensure future operations, for the period of review. PDM, P.R. 169 at 36 (citing GOK NSA QR, C.R. 252-259 at Exhs. E-7, E-8, E-13 through E-19).

To determine whether KEPCO had recovered its costs, Commerce analyzed whether KEPCO had received a subsidy from KPX, the entity from which KEPCO purchases electricity. PDM, P.R. 169 at 36-37. In doing so, Commerce explained that in recent reviews, such as *CORE Second Admin. Review*, 85 Fed. Reg. at 15,112, and accompanying IDM at cmt. 1, it had

analyzed KPX's prices in the context of an upstream subsidy allegation in which it had evaluated "the marginal and capacity price and the adjusted coefficient under a tier 3 analysis and found there was no benefit." PDM, P.R. 169 at 37. Also, Commerce stated that in other recent proceedings, the government of Korea had provided financial statements for the GENCOs covering the period of review (2019) and that Commerce had determined that each of the six GENCOs had recovered its costs. *See Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea*, 86 Fed. Reg. 35,267 (Dep't of Commerce July 2, 2021) (final determ.) (*2019 Seamless Pipe Investigation*), and accompanying IDM at 9. And Commerce explained that in this review the government of Korea had also provided financial statements and that Commerce continued to find that "each of the six GENCOs recovered its costs," and that the price that KEPCO paid KPX "is inclusive of a rate of return." PDM, P.R. 169 at 37 (citing GOK NSA QR, C.R. 252-259 at 3-9, 26-30, Exh. E-5 at 3-4, Exhs. E-6 through E-9; GOK NSA SR4, C.R. 282-284 at 2-3 and Exh. E-27.1).

Next, Commerce analyzed KEPCO's 2019 costs as reported to the MOTIE and supporting documentation, along with Hyundai Steel's and POSCO's electricity usage data. PDM, P.R. 169 at 37-38. For return on capital, or rate of return, Commerce explained that the government of Korea "provided the relevant regulation, formula and calculation, and tied each of the reported numbers in the formula to KEPCO's financials or source documentation," which showed that "the rate of return is inclusive of its reported costs to MOTIE." PDM, P.R. 169 at 38 (citing GOK NSA QR, C.R. 252-259 at 11-17; GOK NSA SR 2,C.R. 274-275 at 4-6). From this information Commerce was "able to trace the costs and the rate of return to KEPCO's submitted cost data through to its recovered costs for each tariff classification." PDM, P.R. 169

at 38 (citing Hyundai Steel Preliminary Calc. Memo., C.R. 312-313; POSCO Preliminary Calc. Memo, C.R. 314-316; GOK NSA QR, C.R. 252-259 at 9, 14-16, Exh. E-17).

Commerce then compared Hyundai Steel's and POSCO's reported industrial tariff rates to KEPCO's cost data. PDM, P.R. 169 at 38. From this comparison, Commerce explained that, although certain industrial rates recovered costs and a rate of return, other rates did not. PDM, P.R. 169 at 38. For the rates that did not cover costs and a rate of return Commerce "determined a percentage amount that would enable cost recovery and a rate of return" and multiplied this percentage amount by the Korean won per kilowatt hour rates assigned to each applicable electricity classification Hyundai Steel and POSCO paid to increase the per-unit price for the applicable electricity classification to a per-unit benchmark sufficient for cost recovery and a rate of return for each respondent. PDM, P.R. 169 at 39; Hyundai Steel Preliminary Calc. Memo., C.R. 312-313 at 8-10 and Attachment II, C.R. 313 at "Industrial A Elect Purchases", "Elec for LTAR Benefit", and "Electricity Summary" worksheets; POSCO Preliminary Calc. Memo., C.R. 314-316 at 7-8 and Attachment II, C.R. 315 at "Industrial A Elect Purchases", "Elec for LTAR Benefit", and "Electricity Summary" worksheets. Each rate paid by Hyundai Steel and POSCO under the applicable electricity classification rate was then subtracted from each calculated Korean won per kilowatt hour rate to determine the benefit amount, which was then multiplied by the total kilowatt hours of electricity used by Hyundai Steel and POSCO in the plant or complex at issue on a monthly basis. *Id.* The calculated Korean won benefit values for each month at each plant or complex were then summed to determine the total benefit. *Id.* After

performing this analysis, Commerce concluded that any benefit that was provided to Hyundai

Steel and POSCO under those categories was "non-measurable." PDM, P.R. 169 at 39.

> ### 2. Nucor's View That The Government Of Korea's Pricing Data Is "Distorted" Does Not Establish That Commerce's Determination Is Unsupported By Substantial Evidence

Nucor's argument that Commerce's decision is unsupported by substantial evidence

amounts to mere disagreement with the manner in which Commerce analyzed the record

evidence and an invitation to reweigh the evidence, neither of which satisfies its burden under

the substantial evidence standard of review. Nucor Br. at 19-24; *Titan Tire Corp. v. Case New*

*Holland, Inc.*, 566 F.3d 1372, 1379 (Fed. Cir. 2009) (stating that the substantial evidence

standard is a "low evidentiary threshold") (citing *Consol. Edison v. NLRB*, 305 U.S. at 229);

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1324 (Ct.

Int'l Trade 2018) (explaining that "mere disagreement is not a sufficient basis to remand

Commerce's determination").

Nucor contends that the cost data submitted by the government of Korea does not reflect

the actual costs of generating and supplying electricity because KPX and the government of

Korea determine the prices that are paid to the generators. Nucor Br. at 19-22. But as

Commerce explained in the *Final Results*, as directed by the Federal Circuit in *POSCO v. United*

*States*, Commerce analyzed KPX's standardized pricing system, which applies to all electricity

generators in Korea, including the independent generators along with KEPCO and its six wholly-

owned generators or GENCOs. IDM, ECF No. 19-6 at 23 (citing PDM, P.R. 169 at 33). And

Commerce further explained that under this "cost-based pool system," the price for electricity

contains a both a marginal component, representing the variable cost of generating electricity,

and capacity component, representing the fixed cost of generating electricity, as well as an

"adjusted coefficient" for certain fuel types such as nuclear and coal and GENCOs.  PDM, P.R.

169 at 33; IDM, ECF No. 19-6 at 23.

Then, under the "merit order system," "the lowest generator's bid will receive a purchase

order for its supply of electricity and the purchase orders will be issued to the next lowest bid

until the supply for the given hour is met."  PDM, P.R. 169 at 33.  Electricity generators that

submit bids that exceed the system marginal price do not receive purchase orders to supply

electricity for the hour.  *Id.*  Also, the adjusted coefficient:  (1) "prevents over-payment to

generators with low fuel costs (*e.g.,* nuclear and coal)"; and (2) maintains "a differential between

the expected rate of return between the GENCOs and KEPCO."  IDM, ECF No. 19-6 at 23

(citing PDM, P.R. 169 at 33).

Commerce explained that this system "includes fixed and variable costs" and also ensures

that for the GENCOs and KEPCO "the expected rate of return is suitably allocated between the

GENCOs and KEPCO."  IDM, ECF No. 19-6 at 23.  Commerce further explained that KEPCO

must pay the GENCOs for the "total cost of generating electricity, including interest on loans,

even if KEPCO is not profitable."  *Id.*  Also, Commerce explained that it had previously

analyzed the prices paid by KPX in reviews such as the *2019 Seamless Pipe Investigation*, 86

Fed. Reg. at 35,267, and accompanying IDM at 9, and had concluded that those prices are

inclusive of a rate of return.  PDM, P.R. 169 at 37.  Based upon this, Commerce "agree{d} with

the {government of Korea} that both the wholesale and retail pricing is based upon price -setting

methodologies that aim to ensure companies in the chain are able to recover their costs, as well

as a rate of profit."  IDM, ECF No. 19-6 at 23 (citing PDM, P.R. 169 at 32-39).  Further,

Commerce explained that, based upon its prior evaluation of KPX's electricity prices and record

evidence, that "there is a pricing mechanism in place for KEPCO to acquire electricity that does

not confer a benefit." IDM, ECF No. 19-6 at 23. Thus, Commerce concluded that the prices

reported by the government of Korea reflected the costs of electricity generation and supply and

should continue to be the basis for Commerce's analysis. *Id.*

In its brief, Nucor claims that Commerce ignored "overwhelming record evidence" that is

contrary to its position. Nucor Br. at 23. But Nucor does not meaningfully address the record

evidence that Commerce *actually cited in its decision* other than to register its disagreement with

Commerce's conclusion that the government of Korea's cost data reflects market principles. Nor

is there anything improper about Commerce's reference to other proceedings in which it

concluded that the very same tariff schedule was set in accordance with market principles and

other proceedings in which it concluded that KEPCO's and KPX's provision of electricity

conferred no benefit because KEPCO recovered its costs, which included a rate of return. PDM,

P.R. 169 at 37; *see also Habas Sinai v. Tibbi Gazlar Istihsal Endustrisi A.S.*, 536 F. Supp. 3d

1333, 1343 (Ct. Int'l Trade 2021) (sustaining Commerce's LTAR analysis where it is "in line {}

with prior determinations.")

As Commerce stated in the underlying determination, Commerce's analysis "is not based

on KEPCO's total revenue but rather on KEPCO's methodology for determining the adequacy of

its pricing through cost and revenue data." IDM, ECF No. 19-6 at 22 (citing PDM, P.R. 169 at

38). Thus, Commerce's analysis "relates to financial performance only to the extent income

from prices charged in each electricity consumption category covers KEPCO's costs, plus

profit." IDM, ECF No. 19-6 at 22. Commerce determined that the prices paid by POSCO and

Hyundai Steel are the prices charged to all companies in the corresponding electricity

consumption classifications, and further took into account whether the prices Hyundai Steel and

POSCO paid were covering KEPCO's costs. *Id.* Although Nucor argues that Commerce should

disregard a market analysis of KEPCO's pricing and simply focus on a comparison of the prices charged to Hyundai Steel and POSCO to KEPCO's cost plus profit rate as a means of determining whether a benefit exists, 19 C.F.R. § 351.511(a)(2)(iii) necessarily requires that Commerce evaluate whether KEPCO's pricing is consistent with market principles, which the record demonstrates.

Further, even assuming that Nucor had cited more evidence, a position with which we disagree, Commerce's determination would still be supported by substantial evidence. As the Supreme Court explained in *Consolidated Edison*, 305 U.S. at 229, substantial evidence is "more than a mere scintilla" and is "such relevant evidence as a reasonably mind might accept to support a conclusion." Finally, that Nucor could review the evidence and reach a different conclusion does not establish that Commerce's determination is unsupported by substantial evidence. *Consolo*, 383 U.S. at 620. Accordingly, Nucor has failed to meet its burden of establishing that Commerce's determination is unsupported by substantial evidence.

### C.   Commerce's Application Of Its Tier 3 Benchmark Is In Accordance With Law

Nucor's disagreement with Commerce's application of its tier 3 benchmark does not diminish the fact that Commerce's determination is in accordance with law. Nucor Br. at 1-18. Nucor contends that Commerce erred in focusing on the aggregate performance of the government supplier rather than the prices paid by Hyundai Steel and POSCO and that Commerce failed to adhere to its methodology for evaluating whether prices were set in accordance with market principles set forth in the remand in *POSCO v. United States*, Consol. Ct. No. 17-00137 (March 16, 2021) (*POSCO* Remand); Nucor Br. at 12-19.

There is no merit to any of these claims. Although Nucor might have preferred a different approach, its subjective preferences do not meet its burden of establishing that

Commerce's interpretation is not a "reasonable choice within the range permitted by the statutory words." *Nucor*, 927 F.3d at 1248 (citing *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 321 (2014)).

Commerce acted in accordance with law when it applied its tier 3 benchmark by examining the electricity prices set by KEPCO and whether those prices "allow{ed} for the recovery of costs, plus a rate of return or profit." IDM, ECF No. 19-6 at 20 (citing PDM, P.R. 169 at 38). As Commerce correctly stated in the *Final Results*, the Federal Circuit upheld this approach in *Nucor v. United States*, 927 F.3d at 1254-55, and did not question it in *POSCO v. United States*, 977 F.3d 1369, other than to require Commerce to examine both KEPCO and KPX, which Commerce did here. In *Nucor*, Commerce evaluated whether KEPCO's prices for electricity "do not fully reflect its actual costs of the electricity that it transmits and distributes to its customers in Korea" and concluded that "KEPCO's standard pricing mechanism used to develop its tariff schedule was based upon its costs." *Nucor*, 927 F.3d at 1247 (citing Commerce's determination). In doing so, Commerce examined how KEPCO (1) calculated its overall costs, including how it distributed the overall cost according to the stage of providing electricity, (2) divided costs into fixed and variable costs, and (3) calculated the cost by applying the "electricity load level, peak level and the patterns of consuming electricity." *Id.* Next, Commerce explained that each cost was then distributed into the fixed charge and the variable charge, taking into consideration the electricity load level, the usage pattern, and the volume of electricity consumed and costs were then distributed according to the "numbers of consumers for each classification of electricity." *Id.*

In upholding Commerce's conclusion that "KEPCO's pricing met familiar standards of cost recovery," the Federal Circuit in *Nucor* found "no reversible error in Commerce's decision

to rely on that combination of facts as sufficient to meet the 'adequate remuneration' standard." *Nucor*, 927 F.3d at 1254. Further, the Court explained that its holding – that Commerce must "ensur{e} that the government authority's price is not too low considering what the authority is selling" – was "limited in constraining Commerce" and left "a large range of potential implementation choices." *Id.*

The only difference between Commerce's analysis of cost recovery in this case and the one in *Nucor* is that Commerce also followed the Federal Circuit's *POSCO* instructions that Commerce must "investigate and consider KPX's impact on the Korean electricity market." Here, Commerce examined data and information regarding KPX. 977 F.3d at 1377; PDM, P.R. 169 at 32-39; IDM, ECF No. 19-6 at 20-25. As Commerce explained in the *Final Results*, Commerce's tier 3 benchmark analysis "assesses whether the electricity prices charged by KEPCO are consistent with market principles by evaluating the electricity prices to see if they allow for the recovery of costs, plus a rate of recovery or profit." IDM, ECF No. 19-6 at 20 (citing PRM, P.R. 169 at 38). Under this approach, if electricity prices are in accordance with market principles, then Commerce will find that no benefit is conferred. IDM, ECF No. 19-6 at 20-21. Here, Commerce concluded that some electricity prices were in line with market principles, but others were not. *Id.* at 21. And for those that were not, Commerce calculated a benefit amount, which it concluded was non-measurable. *Id.* Commerce also stated that Hyundai Steel and POSCO reported paying electricity prices that are listed on KEPCO's rate schedule, and that supporting documentation indicated that Hyundai Steel's and POSCO's operations were classified under the correct electricity consumption categories. *Id.* (citing GOK

NSA QR, C.R. 252-259 at 1-10, Exh. E-9; Hyundai NSA QR, C.R. 249-251 at Exhs. NSA-2

through NSA-3; POSCO NSA QR, C.R. 266-267 at Exhs. NSA-2 through NSA-3).

Nor is Nucor correct that the government of Korea's provision of electricity did confer a

measurable benefit upon Hyundai Steel or POSCO or that Commerce ignored portions of its

remand redetermination in *POSCO*.  Nucor Br. at 2-4.  As Commerce explained, Nucor reads the

language in the *POSCO* remand out of context.  The full passage states:

> {W}hen the rate charged is consistent with the standard pricing
> mechanism (in this case, the electricity tariffs charged to the
> respondent covers cost plus a return) and the respondent is treated
> no differently than other companies that purchase comparable
> amounts of electricity (in this case, the rate charged to the
> respondent is from the correct tariff classification based on its
> contract demand for electricity and voltage for that electricity
> consumption, as this is a market condition for the provision of
> electricity in Korea), there is no benefit within the
> meaning of section 771(5)(E) of the Act.  In other words, if the
> tariff charged to the respondent does not cover "cost of
> production" plus "a profitable return on the investment," which is
> the same standard set forth in KEPCO's standard pricing
> methodology, then the respondent has received a countervailable
> benefit under section 771(5)(E) of the Act.  Moreover, even in the
> event that the tariff charged to the respondent covers "costs of
> production" plus "a profitable return on the investment," there is
> still a countervailable benefit conferred under the statute if
> KEPCO charges the respondent less than what it should be charged
> under its designated tariff classification.

IDM, ECF No. 19-6 at 21 (quoting the *POSCO* Remand at 30).  Contrary to Nucor's assertions,

Commerce's analysis in this review is consistent with its approach in the *POSCO* proceeding.

IDM, ECF No. 19-6 at 22.  Here, as in *POSCO*, Commerce's tier 3 benchmark analysis also

reviewed whether KEPCO's electricity tariffs covered both cost recovery and a rate of return.

IDM, ECF No. 19-6 at 20 (citing PDM, P.R. 169 at 38).  Commerce's approach is also consistent

with its approach in other cases.  IDM, ECF No. 19-6 at 22 (citing *Certain Cold-Rolled Steel

Flat Products from the Republic of Korea 2017*, 85 Fed. Reg. 38,361 (Dep't of Commerce June

26, 2020) (final results of countervailing duty admin. review), and accompanying IDM at cmt. 1).

Also, there is no merit to Nucor's argument that Commerce's determination is unlawful because it focuses on the financial performance of KEPCO rather than the prices paid by Hyundai Steel and POSCO. Nucor Br. at 15-19. Nucor cites *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't of Commerce June 5, 2008) (final affirmative countervailing duty determ. and final affirmative determination of critical circumstances), and accompanying IDM at 65, *Light-Walled Rectangular Pipe & Tube from the People's Republic of China*, 73 Fed. Reg. 35,642 (Dep't of Commerce June 24, 2008) (final affirm. countervailing duty investigation determ.), and accompanying IDM at 36, and *U.S. Steel Corp v. United States*, 33 C.I.T. 1944 n.10 (2009), but none of those cases involves a tier 3 benchmark analysis. Nucor Br. at 17-18. Those decisions relate to a decision to disregard prices in a tier 1 or tier 2 benchmark analysis instead of as part of a tier 3 benchmark analysis. IDM, ECF No. 19-6 at 22. For example, *U.S. Steel* concerned a tier 1 analysis in which Commerce relied on "actual transactions in the country" vis-à-vis "market-determined prices" to determine that iron ore was being sold for less than adequate remuneration. *U.S. Steel*, 33 C.I.T. at 1944-45. In reaching its determination, Commerce rejected the respondent's assertion that, because the Indian government agency covered its costs, the ore was not sold for less-than-adequate remuneration. *Id.* But in addition to the fact the iron ore in *U.S. Steel* was a fungible commodity for which "market-determined prices" were available, whereas electricity is not, here Commerce

did not determine only that KEPCO recovered its costs; it also determined that the generators selling to KPX recouped their costs plus a return on investment.  PDM, P.R. 169 at 37.

Unlike the decisions upon which Nucor relies, in a tier 3 benchmark analysis no data exists to permit Commerce to examine "actual transactions in the country" vis-à-vis "market-determined prices" (tier 1) or a "world market price…available to purchasers in the country in question" (tier 2).  Thus, Commerce "measure{d} the adequacy of remuneration by assessing whether the government price is consistent with market principles."  19 C.F.R. § 351.511(a)(2)(iii).  It is unclear how Commerce could determine that the "government price is consistent with market principles" *without* examining "the aggregate performance of the government supplier."  Nucor Br. at 2, 10.

Nucor also repeatedly insists that Commerce's determination is fatally flawed because it does not discuss the "the prices paid by the respondents."  Nucor Br. at 2, 12-15.  But, in the context of a tier 3 analysis, Commerce is necessarily without the benefit of "market-determined" or "world market" prices to which it can compare the prices paid "by the respondents."  In fact, circumstances such as this are precisely *why* Commerce developed the tier 3 analysis:  without benchmark prices to rely upon, the regulatory option is to examine whether prices are set "in accordance with market principles."  19 C.F.R. § 351.511(a)(2)(iii); PDM, P.R. 169 at 35 n.273. Commerce thus determined that tariffs are set in accordance with market principles and that Hyundai Steel and POSCO paid the proper market principle-derived tariffs.  Nothing more was required.  Further, as Commerce explained in the *Final Results*, an evaluation of "an entity's financial position, has consistently been part of {Commerce}'s analysis when assessing whether

KEPCO's pricing is consistent with market principles" and was sustained in *Nucor Corporation v. United States*, 927 F.3d at 1243 as meeting the requirements set forth in 19 C.F.R. § 351.511(a)(2)(iii). IDM, ECF No. 19-6 at 22.

Also, as Commerce explained in the *Final Results*, its tier 3 benchmark analysis is not based upon KEPCO's total revenue; instead, it is "KEPCO's methodology for determining the adequacy of its pricing through cost and revenue data." *Id.* at 22 (citing PDM, P.R. 169 at 38). Consequently, Commerce's analysis relates to financial performance only to the extent income from prices charged for each electricity consumption category covers KEPCO's costs, plus profit. IDM, ECF No. 19-6 at 22 (citing PDM, P.R. 169 at 38). And, "{b}ecause . . . Hyundai Steel and POSCO paid electricity prices that are charged to all companies in the corresponding electricity consumption classifications," Commerce's analysis "does account for whether the prices Hyundai Steel and POSCO paid were covering KEPCO's costs." IDM, ECF No. 19-6 at 22.

Finally, there is no merit to Nucor's position that Commerce's tier 3 analysis is unlawful because it allows the government of Korea to subsidize certain customers while recouping losses through charging higher prices to other companies. As explained above, the record evidence demonstrates that the prices paid by Hyundai Steel and POSCO are "those set by KEPCO's electricity rate schedules." IDM, ECF No. 19-6 at 25 (citing Hyundai Preliminary Calc. Memo., C.R. 312-313 POSCO Final Calc. Memo, April 4, 2022, P.R. 199-200, C.R. 327-329). As Commerce explained in the *Final Results*, its analysis is "not to conduct a preferentiality or discrimination analysis but rather to understand the methodology used to develop the electricity rate schedule and whether the rates that are charged in the electricity classifications reported by

the respondents are consistent with market principles."  IDM, ECF No. 19-6 at 25.  Nucor has identified no error in this approach.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiff's motion, sustain Commerce's *Final Results*, and enter judgment for the United States.

Respectfully submitted,

BRIAM M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

W. Mitch Purdy
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for
Trade Enforcement & Compliance
Washington, D.C. 20230

/s/ Elizabeth A. Speck
ELIZABETH A. SPECK
Senior Trial Counsel
United States Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0369
Fax: (202) 514-7965

December 15, 2022

Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court and the

Court's scheduling order in that it contains 7,727 words, including text, footnotes, and headings.


/s/ Elizabeth Anne Speck