## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| NUCOR CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES | ) Before: Hon. Jennifer Choe-Groves, |
| Defendant, | ) Judge |
| and | ) Court No. 22-00137 |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) NONCONFIDENTIAL |
| Defendant- Intervenor. | ) Business Proprietary Information<br>) Removed from Pages 4, 5, 24, 27,<br>) 29, 30, 33, and 34. |

## DEFENDANT-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Yujin K. McNamara
Sarah S. Sprinkle
Daniel M. Witkowski
Devin S. Sikes
Sydney L. Stringer
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic of Korea*

Dated: December 15, 2022

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ........................................................................................... i

**TABLE OF AUTHORITIES** ..................................................................................... ii

**INTRODUCTION** ....................................................................................................1

**ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED** ............1

**STATEMENT OF ISSUES** ......................................................................................1

**STATEMENT OF FACTS** ........................................................................................1

**STANDARD OF REVIEW** .......................................................................................9

**ARGUMENT** ............................................................................................................11

I.    Commerce's Assessment Of The Adequacy Of Remuneration Is Lawful ......................11

      A.    Commerce Has Discretion in Deciding How to Assess the Adequacy of Remuneration ..................................................................11

      B.    Commerce's Approach Is Lawful ................................................................13

II.    Commerce's Findings Regarding The Adequacy Of Remuneration Are Supported By Substantial Evidence ...........................................21

      A.    Record Evidence Demonstrates that the Korean Electricity Market Is Governed by Market Principles ..........................................................22

      B.    The Costs Upon Which Commerce Relied Are Not Tainted .................................26

      C.    The Government Prices to the Respondents Reflected the Cost of Electricity Generation Plus a Return on Investment ...........................................28

**CONCLUSION** .........................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Silicon Techs. v. United States*, 334 F.3d 1033 (Fed. Cir. 2003)............................................. 11

*AMS Assocs., Inc. v. United States*, 737 F.3d 1338 (Fed. Cir. 2013) ........................................... 10

*Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961 (Ct. Int'l Trade 1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987) ........................................................................................ 11, 19

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)............ 10

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ............................................................ 10, 25

*CS Wind Vietnam Co. v. United* States, 832 F.3d 1367 (Fed. Cir. 2016)......................................... 9

*Glycine & More, Inc. v. United States*, 880 F.3d 1335 (Fed. Cir. 2018)........................................ 10

*Hyster Co. v. United States*, 858 F. Supp. 202 (Ct. Int'l Trade 1994).......................................... 21

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ...................................................................................... 10

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016)...................................... 10

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) .......................................... 10

*Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019).................................... 13, 14, 19, 22

*POSCO v. United States*, 556 F. Supp. 3d 1364 (Ct. Int'l Trade 2022) ....................................... 17

*POSCO v. United States*, 557 F. Supp. 3d 1290 (Ct. Int'l Trade 2022) ..................... 18, 21, 22, 30

*POSCO v. United States*, 581 F. Supp. 3d 1272 (Ct. Int'l Trade 2022) ..................... 17, 20, 32, 33

*POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020) ........................................................... 12

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) ............................................................ 11

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996) .................................................. 10

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) .................................................................... 10

*Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467 (2002) .................................................................. 22

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i)........................................................................................................ 9

19 U.S.C. § 1677(5)(E)(iv) .................................................................................................. passim

19 U.S.C. § 1677f-1(e) ................................................................................................ 14

28 U.S.C. § 1581(c) ...................................................................................................... 9

**ADMINISTRATIVE DETERMINATIONS**

*Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017) .................................... 23

*Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 20,821 (Dep't Commerce Apr. 8, 2022) ................................................................................................................... 1

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) ................................................. 16

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Affirmative Determination,* 81 Fed. Reg. 4,996 (Dep't Commerce July 29, 2016) ................................................................................................................... 23

*Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016) ................................................................................................................... 23

*Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Affirmative Determination,* 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016) ................................................................................................................... 23

*Welded Line Pipe from the Republic of Korea: Final Negative Countervailing Duty Determination,* 80 Fed. Reg. 61,365 (Dep't Commerce Oct. 13, 2015) .................................. 23

**REGULATIONS**

19 C.F.R. § 351.503(a) ................................................................................................ 15

19 C.F.R. § 351.503(b)(1) ........................................................................................... 15

19 C.F.R. § 351.511(a)(2) ..................................................................................... passim

**OTHER AUTHORITIES**

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) .............................. passim

**INTRODUCTION**

This brief is submitted on behalf of the Government of the Republic of Korea ("GOK") in response to the arguments raised by Plaintiff, Nucor Corporation (hereinafter "Plaintiff"), relating to alleged errors of law and analysis committed by the U.S. Department of Commerce ("Commerce") in the 2019 administrative review of the countervailing duty ("CVD") order on Cold-Rolled Steel Flat Products ("CRS") from the Republic of Korea. *See* Pl. Nucor Corp.'s Mem. in Supp. of Rule 56.2 Mot. for J. on Agency R., ECF No. 27 ("Pl. Br.").

**ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED**

Plaintiff challenges certain aspect of Commerce's final results in the 2019 administrative review of the CVD order on CRS, published as *Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 20,821 (Dep't Commerce Apr. 8, 2022) (P.R.202) ("*Final Results*").

**STATEMENT OF ISSUES**

1.      Whether Commerce's assessment of the adequacy of remuneration for electricity provided by the GOK is in accordance with law.

2.      Whether Commerce's determination that the GOK did not subsidize Hyundai Steel Co., Ltd., also referred to as Hyundai Steel Company, ("Hyundai Steel") and POSCO (together, "respondents") through the provision of electricity for less than adequate remuneration ("LTAR") is supported by substantial evidence on the record.

**STATEMENT OF FACTS**

***Initiation of Review and New Subsidy Allegation Regarding the Provision of Electricity***

Commerce initiated the administrative review at issue in this case on October 30, 2020. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 68,840 (Dep't Commerce Oct. 30, 2020) (P.R.20).  Commerce selected Hyundai Steel and POSCO as

1

the mandatory respondents.  Memorandum from Natasia Harrison to Dana Mermelstein, "Countervailing Duty Administrative Review of Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Selection of Respondents for Individual Examination" (Dec. 17, 2020) (C.R.5/P.R.21).

On February 24, 2021, Plaintiff filed a new subsidy allegation alleging, in part, that the GOK provided a countervailable subsidy to Hyundai Steel and POSCO in the form of electricity for LTAR.  Letter from Wiley Rein LLP to Sec'y of Commerce, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea: New Subsidy Allegations" (Feb. 24, 2021) (P.R.83-84). Commerce initiated a review of this alleged program on March 12, 2021.  Memorandum from Moses Song to Dana Mermelstein, "Countervailing Duty Administrative Review of Certain Cold-Rolled Steel Flat Products from the Republic of Korea: New Subsidy Allegation" (Mar. 12, 2021) (P.R.107).

***The GOK's and Mandatory Respondents' Questionnaire Responses***

The GOK responded to several questionnaires regarding the alleged provision of electricity for LTAR.  *See* Letter from Yoon & Yang to Sec'y of Commerce, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882: GOK's New Subsidy Allegation Questionnaire Response" (Mar. 25, 2021) ("GOK NSA QR") (C.R.252-259/P.R.121-122); Letter from Yoon & Yang to Sec'y of Commerce, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882: GOK's New Subsidy Allegation Supplemental Questionnaire Response" (Apr. 8, 2021) ("GOK 1st SQR") (C.R.271/P.R.126); Letter from Yoon & Yang to Sec'y of Commerce, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882: GOK's New Subsidy Allegation Second Supplemental Questionnaire Response" (Apr. 22, 2021) ("GOK 2nd SQR") (C.R.274-

275/P.R.129); Letter from Yoon & Yang to Sec'y of Commerce, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882: GOK's New Subsidy Allegation Third Supplemental Questionnaire Response" (May 3, 2021) (C.R.277-278/P.R.132); Letter from Yoon & Yang to Sec'y of Commerce, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882: GOK's New Subsidy Allegation Fourth Supplemental Questionnaire Response" (July 13, 2021) ("GOK 4th SQR") (C.R.282-284/P.R.141-143).

In its questionnaire responses, the GOK explained that the electricity market in Korea is comprised of three different segments: electricity generation, electricity transmission, and electricity distribution.  GOK NSA QR at 3-4 (C.R.252/P.R.121).  It noted that most electricity in Korea is generated by six subsidiaries of the Korea Electric Power Company ("KEPCO") referred to as "GENCOs," although some electricity is also generated by independent power generators and community energy systems.  *Id.* at 3, 5.  However, none of these generation companies directly transmits or distributes electricity to consumers.  *Id.* at 3.  Instead, KEPCO is the exclusive supplier of electricity in Korea, *id.* at 3-4, and KEPCO purchases electricity from the generation companies via the Korea Power Exchange market ("KPX") for distribution to the ultimate customer.  *Id.* at 3.

The GOK also provided information establishing that KEPCO's tariff schedule applicable for the period of review ("POR") set electricity prices sufficient to cover costs, including those related to electricity generation, plus profit.  The GOK noted that, by law, KEPCO is required to establish tariff rates at levels that recover the aggregate costs for supplying electricity.  *Id.* at 7-9.

Further, record evidence establishes that, in 2019, KEPCO earned profit sufficient to cover costs (including for the generation of electricity), plus a return on investment.  *Id.* at 10.  First, the GOK submitted to Commerce information related to KEPCO's operating expenses (i.e.,

cost to purchase electricity, labor costs, grid maintenance fees, and other fees not related to the sales of electricity), and demonstrated how its income covers its costs, plus a return on investment. *Id.* at 11-20 (C.R.252/P.R.121), Exhibit E-17 (C.R.256-258/P.R.121). The GOK explained in detail how KEPCO calculates its return on capital (i.e., rate of return). *See* GOK NSA QR at 13-17, 32-33 (C.R.252/P.R.121). In addition, the GOK submitted to Commerce the outside audit report of KEPCO's overall cost for electricity, GOK 1st SQR at Exhibit E-20 (C.R.271/P.R.126), and provided a fulsome explanation regarding how the results of this audit report connect to the expenses and income the GOK reported. *See* GOK 2nd SQR at 1-4 (C.R.274/P.R.129). Based on this information, the GOK demonstrated that KEPCO's cost recovery rate in 2019 for [

]. GOK NSA QR at 18-20 (C.R.252/P.R.121), Exhibit E-17 (C.R.256-258/P.R.121).

The GOK also provided information regarding the price at which KEPCO purchases electricity from the KPX to demonstrate that these prices were sufficient to cover the cost of electricity production, plus a return on investment for the electricity generators. This price is determined by a formula involving a variable cost component (marginal price), a fixed cost component (capacity price), and an adjustment coefficient factor. GOK NSA QR at 27-29 (C.R.252/P.R.121). Each of these price components has a separate purpose: (1) the marginal price is the amount calculated to compensate the generation companies for fuel costs, the principal component of the variable costs of generating electricity; (2) the capacity price is calculated to compensate the generation companies for fixed costs related to constructing generation facilities; and (3) the adjustment coefficient is calculated to prevent KEPCO's overpayment to certain generation companies with low fuel costs and to maintain a differential between the expected rate of return between the GENCOs and KEPCO. *Id.* at 27-30.

**NONCONFIDENTIAL**

Finally, the GOK provided information substantiating that the price at which KEPCO purchased electricity via the exchange was sufficient to compensate the GENCOs.  The GOK first noted that KEPCO is legally required to pay the GENCOs an amount sufficient to (i) recover their total costs (including fuel, maintenance, and administrative costs) and (ii) pay their interest for loans.  GOK 1st SQR at 7 (C.R.271/P.R.126).  The GOK explained [


], *id.* at 7-9, and the GOK provided detailed information regarding the GENCOs' actual profit/loss information related to electricity activities [


].  GOK 2nd SQR at 7-9, Exhibit E-25 (C.R.274/P.R.129), Exhibit E-27 (C.R.275/P.R.129).  The GOK also placed the financial statements of the six GENCOs on the record.  GOK 4th SQR at Exhibit E-27.1 (C.R.283/P.R.142).

Hyundai Steel and POSCO also responded to questionnaires regarding the alleged provision of electricity for LTAR.  Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882: Hyundai Steel's New Subsidy Allegation Questionnaire Response" (Mar. 22, 2021) ("Hyundai Steel NSA QR") (C.R.249-251/P.R.120); Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882: Hyundai Steel's NSA Supplemental Questionnaire Response" (July 13, 2021) (C.R.281/P.R.140); Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882: POSCO's New Subsidy Allegation Questionnaire Response" (Mar. 29, 2021) ("POSCO NSA QR") (C.R.260-267/P.R.123); Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-

580-882: POSCO's Response to the GOK's NSA Questionnaire Response" (Apr. 5, 2021) (C.R.269-270/P.R.125); Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882: POSCO's New Subsidy Allegation Supplemental Questionnaire Response" (July 16, 2021) (C.R.285/P.R.144).

Hyundai Steel and POSCO included in their responses information regarding their payments for electricity.  Specifically, the respondents explained which tariff classifications covered their purchases of electricity and provided information regarding the tariff rates applicable to their electricity purchases, the total amount purchased during different time periods (by month and time of day), and total amount paid to KEPCO.  Hyundai Steel NSA QR at 1-2, Exhibits NSA-2, NSA-4 (C.R.249/P.R.120); POSCO NSA QR at 2-3, Exhibits NSA-2 (C.R.266/P.R.123), NSA-4 (C.R.267/P.R.123).

***Commerce's Preliminary Results***

In the Preliminary Results, Commerce concluded that it should use a "tier-iii" benchmark pursuant to 19 C.F.R. § 351.511(a)(2) to determine whether the GOK was providing electricity for LTAR.  Memorandum from Scot Fullerton to Christian Marsh, "Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review; 2019: Certain Cold-Rolled Steel Flat Products from the Republic of Korea" (Sept. 30, 2021) ("*Preliminary Results IDM*") at 34-36 (P.R.169).  In the first step in its analysis, Commerce considered whether the prices charged by each segment in the Korean electricity market were set in accordance with market principles:

- <u>First</u>, Commerce noted that the tariff schedule establishing the prices charged by KEPCO for electricity applicable during the POR came into effect in November 2013 and that Commerce had previously determined that this schedule was set in

accordance with market principles, including that the rates were set with consideration to costs and a return on investment.  *Id.* at 36.

- Second, Commerce noted that it had previously evaluated the price-setting mechanism that establishes the prices KEPCO pays the KPX for electricity supply and found no benefit.  *Id.*

- Third, Commerce noted that it had previously evaluated the six GENCOs' financial statements that were placed on the record in this review and concluded that each generating company recovered its costs during the POR.  *Id.* at 37.

Based on this information, Commerce concluded that the prices set by each segment of the electricity market were set in accordance with market principles.

In the second step, Commerce considered whether the specific tariff rates charged by KEPCO were sufficient to recover costs and a return on investment.  Commerce, in conducting this analysis, considered whether the electricity rates for each tariff classification applicable to the respondents were sufficient to cover costs plus a return on capital.  *Id.* at 37-39.  Commerce determined that certain rates were not.  For those rates applicable to the respondents that were not sufficient to cover costs plus a return on capital, Commerce determined that the rates were not set in accordance with market principles and proceeded to assess whether any benefit provided to the respondents was measureable.  *See id.* at 39.  Commerce determined that the benefit amount in each case was not measureable.  *Id.*

**Commerce's Final Results**

Following Commerce's *Preliminary Results*, Plaintiff filed a case brief challenging Commerce's methodology and findings regarding the alleged provision of electricity for LTAR. Brief from Wiley Rein LLP to Sec'y of Commerce, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Case Brief" (Nov. 5, 2021) (C.R.322/P.R.185).  In response, the GOK and the respondents filed rebuttal briefs supporting Commerce's preliminary analysis and findings.  Brief from Yoon & Yang to Sec'y of Commerce, "Certain Cold-Rolled Steel Flat

Products from the Republic of Korea, Rebuttal Brief of the Government of the Republic of

Korea" (Nov. 12, 2021) (C.R.323/P.R.187); Brief from Morris, Manning & Martin, LLP to Sec'y

of Commerce, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case

No. C-580-882: Respondents' Rebuttal Brief" (Nov. 12, 2021) (C.R.326/P.R.190).

In the *Final Results*, Commerce reaffirmed its positions from the *Preliminary Results*

with respect to the GOK's provision of electricity.  Specifically, Commerce found that certain

tariffs applicable to the respondents were in line with market principles because they allowed

KEPCO to fully cover its costs plus a rate of recovery or profit.  Memorandum from James

Maeder to Ryan Majerus, "Issues and Decision Memorandum for the Final Results of the 2019

Administrative Review of the Countervailing Duty Order on Certain Cold-Rolled Steel Flat

Products from the Republic of Korea" (Apr. 1, 2022) ("*Final Results IDM*") at 20-21, 23-24

(P.R.198).  Commerce further noted that, "where the pricing is not in line with market principles,

we determined that a benchmark that would be in line with market principles (i.e., a price that

covers cost plus a rate of recovery or profit), with the difference between the price paid and the

benchmark being the benefit conferred." *Id.* at 21.  Applying that methodology, Commerce

found that there was no measureable benefit from the electricity provided at prices that were not

in line with market principles.  *Id.*

Commerce also fully considered and rejected Plaintiff's arguments that Commerce

should modify its approach.  Commerce declined Plaintiff's suggestion that Commerce abandon

its well-established three-tier approach and instead apply a standard where Commerce directly

compares the various prices paid by the respondents to a single cost plus profit rate for KEPCO

to determine if a benefit exists.  Commerce noted that a consideration of whether income covers

costs plus profit has long been a part of its tier-iii analysis and has been found by the courts to be

within the bounds of 19 C.F.R. § 351.511(a)(2)(iii). *Final Results IDM* at 22-23 (P.R.198). It further rejected Plaintiff's argument that Commerce's analysis should focus solely on the rates that the respondents paid, noting that the analysis it employed was sufficient because the respondents paid prices at the same rates as all companies in the corresponding electricity consumption category. *Id*. Commerce explained that its analysis therefore does consider whether KEPCO's approach for setting those rates is in accordance with market principles. *Id*.

Commerce also addressed Plaintiff's claim that the cost data provided by the GOK does not reflect actual costs of electricity generation. In the *Final Results*, Commerce fully explained how its analysis took into consideration this issue, noting that "we agree with the GOK that the wholesale and retail pricing is based on price-setting methodologies that aim to ensure companies in the chain are able to cover their costs, as well as a rate of profit." *Id.* at 23. Finally, Commerce rejected Plaintiff's suggestion that it should rely on a benchmark price plus an average profit rate from publicly traded utilities in the United States to determine whether a benefit was conferred. In particular, Commerce noted that the entire premise of a tier-iii analysis is that no such appropriate benchmark prices exist. *Id.* at 24-25.

## **STANDARD OF REVIEW**

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c). The Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

The substantial evidence standard requires Commerce to base its determination upon "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *CS Wind Viet. Co. v. United* States, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (internal quotation marks omitted). Substantial evidence "is something less than the weight of the evidence, and the

possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce}'s finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  A party challenging Commerce's finding for lack of substantial evidence "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal quotation marks omitted).

The Court reviews Commerce's interpretation of the statutes it administers under the two-step framework established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016).  Under this framework, the Court first "must determine whether Congress has directly spoken to the precise question at issue." *Id.* (internal quotation marks omitted).  If it has, the Court "must give effect to the unambiguously expressed intent of Congress." *Id.* (internal quotation marks omitted).  If it has not, Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009).  In such circumstances, "{a}ny reasonable construction of the statute is a permissible construction." *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996).

The Court must also ensure that Commerce has complied with its own regulations.  *See AMS Assocs., Inc. v. United States*, 737 F.3d 1338, 1343 (Fed. Cir. 2013).  The Court construes Commerce's regulations using "the same rules {that it} would use in construing a statute." *Glycine & More, Inc. v. United States*, 880 F.3d 1335, 1344 (Fed. Cir. 2018); *accord Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).  Applying these rules, the Court defers to Commerce's "interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of {Commerce}'s intent at the time of the regulation's promulgation."

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks omitted).

"{B}road deference" to Commerce's interpretation "is all the more warranted" because its

regulations "concern{} a complex and highly technical regulatory program." *Id.* (internal

quotation marks omitted).

In terms of Commerce's choice of methodology in reaching its conclusions under the

CVD law, "{a}s long as the agency's methodology and procedures are a reasonable means of

effectuating the statutory purpose . . . the court will not impose its own views as to the

sufficiency of the agency's investigation or question the agency's methodology." *Ceramica*

*Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (Ct. Int'l Trade 1986), *aff'd*, 810 F.2d

1137 (Fed. Cir. 1987); *see also Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1038 (Fed.

Cir. 2003).

## ARGUMENT

## I.   COMMERCE'S ASSESSMENT OF THE ADEQUACY OF REMUNERATION IS LAWFUL

Plaintiff argues that Commerce's finding that the GOK did not provide electricity for

LTAR was unlawful.  Pl. Br. 12-19.  Plaintiff fails to show that Commerce's finding is

inconsistent with the statute or regulation.

### A.   Commerce Has Discretion in Deciding How to Assess the Adequacy of Remuneration

Under the statute, "{a} benefit shall normally be treated as conferred where there is a

benefit to the recipient, including . . . in the case where goods or services are provided, if such

goods or services are provided for less than adequate remuneration."  19 U.S.C.

§ 1677(5)(E)(iv).  The statute further directs that "the adequacy of remuneration shall be

determined in relation to prevailing market conditions for the good or service being provided . . .

in the country which is subject to the investigation or review."  *Id.*  "Prevailing market conditions

include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.* The statute does not define what constitutes "adequate remuneration."

Commerce has issued regulations regarding how it will determine whether remuneration is adequate, setting forth a three-tiered, hierarchical approach. 19 C.F.R. § 351.511(a)(2). First, Commerce prefers to "measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i). In selecting a benchmark, Commerce "will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability." *Id.* If no useable domestic market-determined price is available, Commerce "will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii). Under this second-tier approach, Commerce will "mak{e} due allowance for factors affecting comparability." *Id.*

This case involves Commerce's "tier-iii" methodology. Commerce applies its tier-iii methodology if there is "no world market price available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(iii). In that situation, Commerce "will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles." *Id.* "{I}f Commerce determines that government pricing is not consistent with market principles, then 'a benefit shall normally be treated as conferred.'" *POSCO v. United States*, 977 F.3d 1369, 1372 (Fed. Cir. 2020) (quoting 19 U.S.C. § 1677(5)(E)(iv)). The regulation, however, does not specify how Commerce will make that assessment. When it issued the regulation, Commerce explained in the accompanying Federal Register notice that, "in

situations where the government is clearly the only source available to consumers in the country, we normally will assess whether the government price was established in accordance with market principles." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,378 (Nov. 25, 1998) ("*Preamble*").  Commerce further stated that

> we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination.  We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case.

*Id.*  These statements in the *Preamble* reflect a focus on how the price "was set" and demonstrate that Commerce did not intend to adopt a rigid framework for assessing "whether the government price was set in accordance with market principles."  *Id.*

The Court of Appeals for the Federal Circuit ("Federal Circuit") has held that the statute and Commerce's implementing regulation require "ensuring that the government authority's price is not too low considering what the authority is selling."  *Nucor Corp. v. United States*, 927 F.3d 1243, 1254 (Fed. Cir. 2019).  The Federal Circuit also has emphasized that, although this principle is significant, it is "limited in constraining Commerce" and "leaves a large range of potential implementation choices."  *Id.*  "Commerce has considerable prima facie leeway to make a reasonable choice within the permissible range, and properly justify its choice, based on the language and policies of the countervailing-duty statute as well as practicality and other relevant considerations."  *Id.* at 1255.

**B.      Commerce's Approach Is Lawful**

In the underlying administrative review, Commerce assessed whether the government price was consistent with market principles by determining whether the electricity prices charged by KEPCO allow for the recovery of costs, plus a rate of return.  *Final Results IDM* at 20-21 (P.R.198).  In conducting that analysis, Commerce examined the electricity rates and costs for the

tariff classification applicable to the respondents. *Preliminary Results IDM* at 37-39 (P.R.169).

Plaintiff does not show that Commerce's methodology falls outside the "large range" of

permissible choices for implementing the statutory and regulatory standard. *Nucor Corp.*, 927

F.3d at 1254-55 .

Plaintiff asserts that the "{t}he statute, the regulation, and Commerce's practice . . .

confirm that the basis of the LTAR benefit analysis is the price actually paid by the respondent to

the government supplier for the input under consideration." Pl. Br. 14; *see also* Pl. Br. 12-15.

Plaintiff then claims that Commerce "ignored the prices paid by the respondents to the

government supplier in determining whether a benefit exists," Pl. Br. 15, which Plaintiff argues

is unlawful. Pl. Br. 15-19. Plaintiff's arguments are flawed.

First, the authorities cited by Plaintiff do not address how Commerce is to determine

whether goods "are provided for less than adequate remuneration," pursuant to 19 U.S.C.

§ 1677(5)(E)(iv), when "assessing whether the government price is consistent with market

principles" under the tier-iii methodology provided for in 19 C.F.R. § 351.511(a)(2)(iii). Plaintiff

cites the statutory requirement that Commerce determine "individual countervailable subsidy

rates." Pl. Br. 13 (quoting 19 U.S.C. § 1677f-1(e)). This provision does not address how

Commerce should determine whether remuneration is adequate for goods or services, and

Commerce complied with this provision in any event by calculating separate, individual rates for

the respondents in the *Final Results*. *See* Pl. Br. 11 (stating that Commerce calculated subsidy

rate of 0.46% for Hyundai Steel and 0.22% for POSCO). As to electricity specifically,

Commerce considered the particular tariff rates applicable to the respondents and then used the

companies' actual electricity purchases and sales information to calculate a benefit amount when

Commerce found that certain tariff rates were not set in a manner consistent with market

principles.  *See Preliminary Results IDM* at 37-39 (P.R.169); Memorandum from Moses Y. Song to Brian C. Davis, "Countervailing Duty Administrative Review of Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Calculations for the Preliminary Results: Hyundai Steel" (Sept. 30, 2021) ("Hyundai Steel Preliminary Calculation Memorandum") at 8 and Attachment II (C.R.312-313/P.R.170); Memorandum from Natasia Harrison to Brian C. Davis, "Countervailing Duty Administrative Review of Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Calculations for the Preliminary Results: POSCO" (Sept. 30, 2021) ("POSCO Preliminary Calculation Memorandum") at 9-10 and Attachment II (C.R.314-315/P.R.171).  Commerce found the benefit amounts to be non-measurable.  In doing so, Commerce performed an analysis for the individual respondents, meeting the requirements of 19 U.S.C. § 1677(5)(E)(iv).

Plaintiff also cites 19 C.F.R. § 351.503(b)(1) and 19 C.F.R § 351.511(a)(2)(i)-(ii). Section 351.503(b)(1) describes how Commerce will measure the benefit for programs not addressed elsewhere in its regulations.  Section 351.503(a) provides that, if there is a specific rule for the measurement of a benefit elsewhere in its regulations, then Commerce "will measure the extent to which a financial contribution . . . confers a benefit as provided in that rule."  As noted above, Commerce has a separate regulation specifically providing for its tier-iii methodology, and thus 19 C.F.R. § 351.503(b)(1) is irrelevant.  Plaintiff's citations to 19 C.F.R. § 351.511(a)(2)(i)-(ii) are similarly inapposite, because they describe Commerce's tier-i and tier-ii methodologies, wherein Commerce's first step is to select an existing market price as a

benchmark to measure the adequacy of remuneration.  This case involves Commerce's application of the tier-iii methodology, which applies when such prices are not available.[1]

Plaintiff's case citations also do not support its position, as they either do not address the assessment of whether the government price is consistent with market principles or do not support Plaintiff's argument.  Plaintiff cites *Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China*, 73 Fed. Reg. 70,961 (Dep't Commerce Nov. 24, 2008), *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 82 Fed. Reg. 23,188 (Dep't Commerce May 22, 2017), *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008), *Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, 73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008), and *U.S. Steel Co. v. United States*, 33 CIT 1935 (2009), Pl. Br. 13-14, 17-18, but the cited discussions in those cases all addressed Commerce's use of the tier-i or tier-ii methodologies, not tier-iii.  As Commerce previously has explained, the tier-iii methodology is distinct and "more complicated" than the tier-i and tier-ii methodologies "because *the Department is no longer solely examining prices, but assessing how the government sets it prices* and whether the mechanism by which it determines its prices is consistent with market principles."  *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016), accompanying Issues and Decision Memorandum at 17-18 (emphasis added).  The use of the tier-iii methodology is therefore not analogous to Commerce's use of a tier-i or tier-ii benchmark.

---

[1] Commerce found that KEPCO was the exclusive provider of electricity in Korea (so there are no existing tier-i benchmarks) and that there was no cross-border transmission or distribution of electricity into Korea from foreign countries (so there are no existing tier-ii benchmarks). *Preliminary Results IDM* at 34-35 (P.R.169).

Plaintiff also cites *Certain Cold-Rolled Steel Flat Products from Russia*, *Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007), and *Supercalendered Paper from Canada*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015), which at least all involved the tier-iii methodology.  Pl. Br. 14.  But the cited passages discuss how Commerce constructed a benchmark in order to calculate a benefit amount *after* Commerce had already determined that the government prices were not set consistent with market principles.  Plaintiff's challenge to Commerce's methodology in this case, on the other hand, is focused on the threshold assessment of whether the government set prices in a manner that is consistent with market principles, and the discussion of the specific calculations in those cases is not relevant to that issue.  In any event, the *Preamble* makes clear that Commerce intended to retain flexibility as to how it would apply the tier-iii methodology.  Thus, Commerce's approach for constructing a particular benchmark in those cases in no way precludes the methodology that Commerce adopted in this case.

The only case that Plaintiff cites that would be directly relevant to the issue here is Commerce's remand results in the *POSCO* litigation.  Pl. Br. 12.  Plaintiff, however, overlooks the fact that Commerce applied fundamentally the same methodology for assessing whether the setting of government prices was consistent with market principles in that case as in this case, and Commerce's remand results in that case were upheld by this court.  *See Final Results IDM* at 20-22 (P.R.198); *POSCO v. United States*, 556 F. Supp. 3d 1364, 1370-71 (Ct. Int'l Trade 2022).  Commerce has employed a similar framework to analyze KEPCO's pricing in other Korea CVD cases with similar records, which likewise have been sustained.  *Final Results IDM* at 20-22 (P.R.198); *see also POSCO v. United States*, 581 F. Supp. 3d 1272 (Ct. Int'l Trade 2022) (sustaining analysis of whether electricity rates were set in accordance with market principles

based on KEPCO's cost recovery); *POSCO v. United States*, 557 F. Supp. 3d 1290 (Ct. Int'l Trade 2022) (same).

Second, Commerce did not completely "ignore{} the prices paid by the respondents" in favor of the "government supplier's revenue from sales to all customers," as alleged by Plaintiff. Pl. Br. 15, 18.  Instead, Commerce confirmed that the respondents were properly placed into the appropriate electricity consumption categories and that they paid the electricity prices in the rate schedule applicable to those classifications.  *Final Results IDM* at 20-21 (P.R.198).  Commerce then determined whether the rates charged for each classification covered the cost of supplying electricity to that tariff classification.  *See Preliminary Results IDM* at 37-39 (P.R.169); Hyundai Steel Preliminary Calculation Memorandum at 8 and Attachment II (C.R.312-313/P.R.170); POSCO Preliminary Calculation Memorandum at 9-10 and Attachment II (C.R.314-315/P.R.171).  Because the respondents paid the same rates as the other companies within their classifications, Commerce's analysis of whether the rates were set in a manner consistent with market principles necessarily incorporated the rates paid by the respondents.  *See Final Results IDM* at 22 (P.R.198).

Plaintiff fails—in making this argument—to acknowledge Commerce's explanation for how it would apply its tier-iii methodology when it issued the regulation.  In the *Preamble*, Commerce explained that it would look at how "the government price was established," or, as Commerce also phrased it, how "the government price was set."  *Preamble*, 63 Fed. Reg. at 65,378.  The electricity prices were not set specifically for the respondents, and thus the government price in this instance is not respondent-specific.  Rather, the tariff rates paid by the respondents were generally applicable to the companies in their electricity tariff classifications, and the prices were established for those classifications.  Among the factors that Commerce said

it might consider in a tier-iii analysis were "the government's price-setting philosophy" and "costs (including rates of return sufficient to ensure future operations)." *Id.* Given that the rates are broadly applicable to all companies in the electricity tariff classification, it is unclear how Commerce could examine the government's "price-setting philosophy" without looking at how the rates were set for the electricity tariff classification. The Federal Circuit also has upheld Commerce's use of a tier-iii analysis to determine the adequacy of remuneration for electricity based on "familiar standards of cost recovery" similar to the one employed in this case. *See Nucor Corp.*, 927 F.3d at 1254. Given that the electricity rates were established for the classification instead of individual companies, it was reasonable and appropriate for Commerce to consider the GOK's price-setting philosophy and its costs as they related to each tariff classification generally in assessing whether the prices constitute adequate remuneration. In sum, Commerce's methodology is a reasonable means to effectuate the statute, and it is deserving of deference. *See id.*; *Ceramica Regiomontana*, 636 F. Supp. at 966.

Plaintiff also asserts that "Commerce's methodology gives governments *carte blanche* to engage in harmful cross-subsidization" and claims that the benchmarks Commerce constructed for certain electricity rates that were found to not be set in accordance with market principles demonstrates such cross-subsidization. Pl. Br. 18-19. As explained further in the section addressing Plaintiff's substantial evidence arguments, *infra*, Korean electricity prices (and electricity prices generally) are affected by supply and demand considerations that vary over the course of a day and over the course of a year. Plaintiff's comparison of certain monthly off- and mid-peak purchases made by the respondents—the prices of which were affected by seasonality and the time of day when electricity was consumed—to a single, annual average cost ignores the prevailing market conditions for electricity in Korea that distort such a comparison. The statute

demands that "the adequacy of remuneration shall be determined in relation to prevailing market conditions." 19 U.S.C. § 1677(5)(E)(iv).  As this court has previously stated, "it would seem that setting lower rates for lower demand during off-peak hours is consistent with market principles rather than being a hallmark of 'de facto cross-subsidization.'" *POSCO*, 581 F. Supp. 3d at 1281.

Moreover, KEPCO sets electricity prices based on the classification of the purchaser, charging the same rates to similarly situated electricity consumers, and Commerce conducted its cost recovery plus profit analysis on the industrial classification rates applicable to the respondents. *Preliminary Results IDM* at 38 (P.R.169).  The respondents were subject to the same rate structure as the other industrial users in its classifications, and they purchased electricity during on-peak, mid-peak, and off-peak periods.  Hyundai Steel NSA QR Exhibit NSA-2 (C.R.249/P.R.120); POSCO NSA QR Exhibit NSA-2 (C.R.266/P.R.123).  It stretches logic to conclude that the GOK is cross-subsidizing the respondents *by charging the same prices* to other, similarly situated electricity customers.  Under Plaintiff's theory, the same tariff paid by the respondents would constitute excessive remuneration when charged to other industrial users, which is nonsensical.  Commerce's evaluation of those broadly applicable rates based on the classification level as a whole was reasonable.

Commerce's apples-to-apples comparison of average annual costs and average annual prices allowed it to determine that the rates paid by the respondents, which are the same rates paid by other companies in its classifications, were based on market principles and thus reflect adequate remuneration for the electricity provided.  Notably, even when applying a tier-i or tier-ii methodology, Commerce will take into account factors affecting comparability between the government price and the benchmark price.  19 C.F.R. § 351.511(a)(2)(i)-(ii).  Commerce's

analysis achieved a reasonable comparison between the broadly applicable government price for electricity and KEPCO's and the GENCO's costs, and it comports with how Commerce explained that it would apply the tier-iii methodology in the *Preamble*. Although Plaintiff "may have preferred for Commerce to have used a different analytical model," Commerce's methodology "permitted it to make the necessary statutory findings," and "it is Commerce, as the administering agency, that is to determine the analytical approach to establish whether a countervailable subsidy exists." *POSCO*, 557 F. Supp. 3d at 1301; *cf. Hyster Co. v. United States*, 858 F. Supp. 202, 206 (Ct. Int'l Trade 1994) ("It is not for this Court to direct Commerce to choose one methodology over another where both methodologies are reasonable. While plaintiffs articulate another possible methodology, they fail to demonstrate to the Court how the methodology used by Commerce is unreasonable, not based on substantial evidence or not in accordance with law."). Commerce's methodology accordingly should be sustained.

## II. COMMERCE'S FINDINGS REGARDING THE ADEQUACY OF REMUNERATION ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

Plaintiff also argues that Commerce's finding that some electricity prices were in line with market principles and thus conferred no benefit was unsupported by substantial evidence. Pl. Br. 19. As noted above, Commerce concluded that "(1) KEPCO fully recovered costs and, by extension, did not confer a benefit; or (2) the prices for electricity resulted in a non-measureable benefit during the POR." *Final Results IDM* at 20 (P.R.198). Plaintiff's arguments focus on the first category, i.e., those sales for which Commerce determined KEPCO covered its costs. As the record demonstrates, Commerce collected and evaluated relevant evidence regarding whether KEPCO set electricity prices according to market principles, and its decision regarding this issue is supported by substantial evidence.

As an initial matter, Plaintiff's arguments that Commerce's findings are not supported by substantial evidence are largely based on objections regarding the methodology Commerce adopted in conducting its analysis.  As noted above, Commerce has broad authority to determine which methodology to employ in its tier-iii analysis.  The Federal Circuit has noted that a "great variety of methodologies {have been} used over time to ensure that rates of a monopoly provider are not too low, some directly focused on value (such as 'fair value'), some on various measures of 'cost' (which may reflect value)."  *Nucor Corp.*, 927 F.3d at 1254-55 (citing *Verizon Commc'ns Inc. v. FCC,* 535 U.S. 467, 484-86 (2002)); *see generally Verizon*, 535 U.S. at 477-89).  Therefore, Commerce "has considerable prima facie leeway to make a reasonable choice within the permissible range, and properly justify its choice, based on the language and policies of the countervailing duty statute as well as practicality and other relevant considerations." *Nucor Corp.*, 927 F.3d at 1255.  Again, just because Plaintiff "may have preferred for Commerce to have used a different analytical model" does not mean that Commerce's conclusions are unsupported by substantial evidence.  *POSCO*, 557 F. Supp. 3d at 1301.  For the reasons discussed below, Plaintiff's arguments otherwise are without merit.

### A. Record Evidence Demonstrates that the Korean Electricity Market Is Governed by Market Principles

Plaintiff first argues that record evidence demonstrates the Korean electricity market is not governed by market principles.  However, record evidence supports Commerce's conclusion that it is.

As discussed in detail above, Commerce relied on a tier-iii analysis in its evaluation of this alleged subsidy.  In accordance with 19 C.F.R. § 351.511(a)(2)(iii), Commerce will measure the adequacy of remuneration by "assessing whether the government price is consistent with market principles," including by reviewing "such factors as the government's price-setting

philosophy {and} costs (including rates of return sufficient to ensure future operations)."
*Preamble*, 63 Fed. Reg. at 65,378.  Commerce must also evaluate the adequacy of remuneration
in relation to the prevailing market conditions.  19 U.S.C. § 1677(5)(E)(iv).

Based on these parameters, Commerce has repeatedly held that electricity prices charged
by KEPCO are consistent with market principles if these prices allow for the recovery of costs
related to electricity generation and a profit or return on investment.[2]  This approach accords
with the Federal Circuit's decisions in *Nucor* and *POSCO*.

Record evidence supports Commerce's conclusions that KEPCO's prices are in line with
market principles.  In particular, record evidence establishes that the rates charged by KEPCO
were set at a level that enabled KEPCO, the KPX, and the GENCOs to recover their costs of
electricity generation plus a return on investment.  *See, e.g.*, *Preliminary Results IDM* at 36
(P.R.169).  First, Commerce noted that it had previously evaluated the applicable tariff schedule
that came into effect in November 2013 and the pricing methodology that was in place during the
POR and determined, based on record evidence, that both were set according to market
principles.  *Id.*  After reviewing record application approval documents, cost information, and

---

[2] Commerce has addressed the same issue using the same standard in multiple proceedings.  *See Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017), and accompanying IDM at Comment 2; *see also Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Affirmative Determination,* 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016), and accompanying IDM at Comment 2; *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Affirmative Determination,* 81 Fed. Reg. 4,996 (Dep't Commerce July 29, 2016), and accompanying IDM at Comment 2; *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part,* 81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016), and accompanying IDM at Comment 2; *Welded Line Pipe from the Republic of Korea: Final Negative Countervailing Duty Determination,* 80 Fed. Reg. 61,365 (Dep't Commerce Oct. 13, 2015), and accompanying IDM at Comment 1.

past verification reports, Commerce confirmed there were no changes to the program since the issuance of its prior findings, and thus determined that KEPCO recovered its cost of electricity generation and supply plus a return on investment for the POR. *Id*.

Second, in accordance with the recent Federal Circuit decisions in *Nucor* and *POSCO*, Commerce also considered the prices that the KPX charged to KEPCO in its analysis of whether electricity was provided for less than adequate remuneration. *Id.* at 36-37. Specifically, Commerce "evaluated the marginal and capacity price and adjusted coefficient under a Tier 3 analysis." *Id.* at 37. It concluded, based on this evaluation, that the KPX's prices were sufficient to cover costs and rate of return and, thus, provided no benefit. *Id*.

Finally, Commerce closely reviewed details about the GENCOs' reported profits and losses during the POR. In its review, Commerce considered the GENCOs' income statements and financial statements, the GOK's explanation regarding [


], and detailed information regarding the GENCOs' actual profit/loss information related to electricity activities [                                                    ]. *See* GOK 1st SQR at 7-9 (C.R.271/P.R.126); GOK 2nd SQR at 7-10, Exhibit E-25 (C.R.274/P.R.129), Exhibit E-27 (C.R.275/P.R.129); GOK 4th SQR at Exhibit E-27.1 (C.R.283/P.R.142). Based on its review of the GENCOs' financial performance, Commerce concluded that the GENCOs, too, recovered their costs and a rate of return in 2019. *Preliminary Results IDM* at 37 (P.R.169). As a result, it is clear that Commerce thoroughly analyzed the information on the record and that there is substantial evidence supporting its determination that KEPCO set electricity prices in accordance with market principles.

Plaintiff argues otherwise.  However, Plaintiff fails to even establish that Commerce *could* have drawn another conclusion from the record evidence, which would—of course—still be insufficient to require Commerce to reverse its decision in any event.  *Consolo*, 383 U.S. at 620 ("{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent {the agency's}'s finding from being supported by substantial evidence.").  Instead, Plaintiff erroneously focuses on irrelevant facts in an attempt to suggest the Korean electricity market generally is not governed by market principles.

Plaintiff begins its argument by comparing Korea's energy usage to that of other developed countries and describing the high energy intensity of the Korean economy, noting that the steel manufacturers comprise some of the country's largest electricity consumers.  Pl. Br. 19-20.  However, Plaintiff provides no explanation as to how these alleged facts are relevant to the issue at hand.  These facts do not address factors such as "the government's price-setting philosophy {or} costs (including rates of return sufficient to ensure future operations)" and are therefore unrelated to Commerce's analysis regarding whether prices were set in accordance with "market principles."  *Preamble*, 63 Fed. Reg. at 65,378.  Further, focusing on other energy markets around the world completely ignores the "prevailing market conditions" within the Korean market itself, which is in direct contradiction of the statute.  19 U.S.C. § 1677(5)(E)(iv).

Plaintiff then goes into a lengthy discussion regarding how the electricity market in Korea is owned, operated, directed, and controlled by the government through KEPCO.  Pl. Br. 20-21.  Again, however, this is completely irrelevant to Commerce's analysis.  Even assuming that Korea's electricity market is "controlled" by the government (which the GOK does not concede), this would not establish that KEPCO is providing electricity for LTAR.  The tier-iii methodology is used precisely in such situations—i.e., where the government is the sole provider

of a good or service.  A tier-iii analysis is necessary *because* the mere fact that the government is the sole supplier in a market does not in and of itself lead to the conclusion that the prices within the market are inconsistent with market principles.  Instead, a proper assessment of prices charged—and the methodology used to set those prices—is required to determine compliance with market principles.  Commerce did that here.  Regardless of the level of GOK involvement in the electricity market, the key fact remains that the electricity tariffs were sufficient for KEPCO and the GENCOs to cover their costs plus a return on capital.

Commerce has properly reviewed the evidence on the record, and its conclusion that certain electricity prices were in line with market principles and therefore conferred no benefit is supported by substantial evidence.  Plaintiff's assertions to the contrary are without merit.

### B.       The Costs Upon Which Commerce Relied Are Not Tainted

Plaintiff next takes issue with Commerce's evaluation of the cost dataset on the record, asserting that the cost data provided by the GOK do not "reflect the actual costs of electricity generation and supply," and arguing that Commerce's reliance on the reported data was therefore erroneous.  Pl. Br. 22.  Again, however, Commerce's determination that cost data submitted by the GOK reflect the actual cost of electricity generation and supply is supported by substantial evidence on the record.

Record evidence establishes that KEPCO and the six GENCOs cover their costs plus a sufficient rate of return.  Commerce examined KEPCO's costs and was "able to trace the costs and the rate of return" submitted by the GOK.  *Preliminary Results IDM* at 38 (P.R.169).  Further, as explained above, Commerce separately reviewed the financial results of the GENCOs during the POR and concluded that the GENCOs recovered their costs.  *Id.* at 36-37.  Moreover, Commerce found that the KPX's standardized price setting methodology, which applies to all electricity generators in Korea, considers both the fixed and variable costs of generating

**NONCONFIDENTIAL**

electricity and "includes consideration of the GENCO's and KEPCO's rate of return." *Id.* at 37; *see also* GOK NSA QR at 27-30 (C.R.252/P.R.121) (establishing that the rate of return is allocated between KEPCO and the GENCOs). Commerce therefore concluded that the pricing system used by the KPX establishes prices in line with market principles because the price levels are set to cover the cost of electricity generation and distribution plus a return on investment for KEPCO and the GENCOs. *Preliminary Results IDM* at 36-37 (P.R.169). In this way, Commerce's conclusion is supported by substantial record evidence.

Plaintiff takes issue with Commerce's analysis, claiming that "cost data that the GOK provided . . . does not reflect the actual costs of electricity generation and supply." Pl. Br. 22. This position is unfounded. As an initial matter, Plaintiff inaccurately asserts that Commerce failed to collect information regarding the actual cost of generation and supply from the generators themselves, and—instead—relied solely on the price mechanism establishing the prices KEPCO pays to purchase electricity through the KPX in its evaluation of cost. Pl. Br. 22. This is simply untrue. As discussed above, Commerce evaluated the financial position of the GENCOs, including by gathering data in multiple questionnaire responses and considering the GENCOs' financial statements. GOK NSA QR at 3-5 (C.R.252/P.R.121); GOK 1st SQR at 7-9 (C.R.271/P.R.126); GOK 2nd SQR at 7-10, Exhibit E-25 (C.R.274/P.R.129), Exhibit E-27 (C.R.275/P.R.129); GOK 4th SQR at Exhibit E-27.1 (C.R.283/P.R.142). Based on this thorough evaluation, Commerce concluded that the GENCOs recovered their costs during the POR. *Preliminary Results IDM* at 36-37 (P.R.169).

Further, Plaintiff fails to cite to any evidence that suggests that these electricity prices were *not* set to cover costs plus a rate of return. Plaintiff first argues that KEPCO's cost datasets were based on [                                                                                    ].

However, this in no way establishes that the reported costs were inaccurate. Plaintiff also objects to the pricing mechanism applied by the KPX, which it claims "operates in practice as an *ad hoc* reallocation of revenue based on the financial performance of KEPCO and individual generators at the time that it is established." Pl. Br. 22. This is an unsubstantiated assertion by Plaintiff that does nothing to establish that KEPCO's costs are distorted. Moreover, even if true, Plaintiff's argument would be irrelevant to Commerce's analysis. Commerce's analysis focuses on whether the prices charged by the supplier are sufficient to cover costs plus a rate of return; as long as this is the case, it is irrelevant how the supplying entity allocates profit. Based on record evidence, Commerce found that the GENCOs recovered their actual costs, as did KEPCO, and that the rates were set to allow KEPCO and the GENCOs a rate of return. Plaintiff identifies no evidence that suggests the cost data on the record are not accurate. Thus, given the prevailing market conditions in Korea for the generation and distribution of electricity, the retail electricity tariffs were consistent with market principles because the tariffs fully cover the cost of electricity production and distribution plus a rate of return.

Based on the above, it is clear that Commerce has properly reviewed the evidence on the record, and Commerce's reliance on cost data on the record is reasonable and supports its determination. Plaintiff's argument otherwise is without merit.

C.    **The Government Prices to the Respondents Reflected the Cost of Electricity Generation Plus a Return on Investment**

Finally, Plaintiff claims—incorrectly—that the electricity prices paid by the respondents did not cover the cost of electricity generation. Pl. Br. 23-24. However, in making this argument, Plaintiff distorts Commerce's benchmark analysis and completely disregards prevailing market conditions, which render Plaintiff's comparisons unreasonable.

Plaintiff maintains that a proper methodology would compare the average cost of supply for a particular tariff classification to the prices the respondents paid based on month and time of use and provides calculations that it contends demonstrate that the prices paid by the respondents did not cover the cost of production plus a return on investment.  Pl. Br. 23-24.  These calculations are fundamentally flawed.  As an initial matter, and as discussed above in Section I.B, it was reasonable and appropriate for Commerce in its analysis to consider the GOK's price-setting philosophy for the *tariff classification* instead of evaluating the rates paid by individual companies, because the electricity rates were established for the classification and not for individual companies.  Plaintiff disregards this fact.

Further, Plaintiff's analysis suffers from two additional flaws: first, Plaintiff inconsistently cherry-picks data to support its position; and, second, Plaintiff completely ignores prevailing market conditions in the Korean electricity market.  In its analysis, Plaintiff selectively identifies only POSCO's [                                        ], noting that POSCO paid monthly off-peak prices under the [                                ] electricity rate classification of [                                ] and mid-peak prices of [            ] in [                        ] during the POR for [                        ].  Pl. Br. 23-24. Plaintiff then concludes that these prices do not cover the costs of electricity generation as KEPCO's reported *average* unit cost of supply for this electricity rate classification for all times of day for the entire year was [                        ].  Pl. Br. 24.  Plaintiff's analysis of the prices charged for supplying electricity to Hyundai Steel are similarly distorted.  Plaintiff selectively identifies the [            ] mid-peak prices paid by Hyundai Steel's [                    ], noting that Hyundai Steel paid mid-peak prices of [                ] in [                        ] to argue

that these prices did not sufficiently cover KEPCO's reported average unit cost of supply for this

electricity rate classification (i.e., [                    ]). Pl. Br. 24.

As an initial matter, this Court has already concluded that Plaintiff's price comparisons

relying on cherry-picked data are insufficient to establish that Commerce's analysis or

conclusions are not supported by substantial evidence:

> Nucor's price comparison also lacks merit.  Nucor seeks to compare the lowest
> monthly average off-peak price paid by the respondents for certain months of the
> POI to the lowest annual average unit price paid to a KEPCO generator. . . . Given
> that the KPX set prices on an hourly basis . . . , Nucor's inconsistent cherry-picking
> of data fails to demonstrate that the respondents paid less for their respective
> electricity consumption than was necessary to allow the generators to recover the
> costs of supplying that electricity and it does not call into question Commerce's
> analysis or conclusions.

*POSCO*, 557 F. Supp. 3d at 1300-01.  In the instant case, Nucor's comparisons are just as

flawed, if not worse: again, Nucor focuses on the **[        ]** off- and mid-peak prices, but then

compares these prices to KEPCO's average costs for supplying electricity to all customers within

the relevant classification at all times of day for the entire year.  This Court should continue to

conclude that Nucor's price comparisons based on cherry-picked data are unpersuasive.

Further, it is nonsensical to compare an *average* cost to time-specific prices established

based on varying costs of production, and doing so fails to take into account the prevailing

market condition in the Korean electricity market.  As electricity is consumed immediately rather

than being stored, the relationship between supply and demand is heavily affected by seasonality

and the time of day.  As explained in KEPCO's Form 20-F, the KPX's pricing formula takes into

account the "marginal price of electricity *at a given hour* at which the projected demand for

electricity and the projected supply of electricity for such hour intersect."  GOK NSA QR at

Exhibit E-1, p. 36 (C.R.252/P.R.121) (emphasis added).  When demand is low, KEPCO sources

electricity for distribution from the lowest-cost generators (e.g., nuclear or coal), thereby

30

meriting a lower price to the downstream customers; when demand is high, KEPCO has to source electricity from higher-cost generators as well (e.g., oil and/or liquefied natural gas ("LNG")), thereby requiring a higher price from its downstream customers. *Id*. In turn, the tariff rates charged by KEPCO take these prevailing market conditions regarding the cost of generation and demand into account by establishing different tariff rates based on the time of day and seasonality. *Id.* at Exhibit E-9 (C.R.255/P.R.121). Therefore, if Commerce were to rely on the comparison suggested by Plaintiff, it would be ignoring prevailing market conditions in the Korean electricity market in a way that contravenes the statute.[3]

The data on the record allowed Commerce to compare the revenue generated from the tariffs charged to companies within a classification against the annual average cost for supplying electricity to that tariff classification. This comparison is an apples-to-apples analysis that accounts for the prevailing market conditions in Korea, as it incorporates the average cost for generating and distributing electricity for all times of day for all periods of the year to the average revenue generated from supplying electricity at the applicable rates at all times of day for all periods of the year. The comparison also reflects how the tariff rates were set, which was for classifications instead of individual companies. As noted above, Commerce will take into account factors affecting comparability between the government and benchmark prices even when applying its tier-i or tier-ii methodologies. 19 C.F.R. § 351.511(a)(2)(i)-(ii) (stating that, in identifying a tier-i benchmark, Commerce "will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability," and Commerce will make

---

[3] As explained above in Section I.B, in Plaintiff's assessment of Commerce's methodology, Plaintiff's comparison of the respondents' disaggregated monthly purchases, which are impacted by seasonality and the time of day that the companies consumed electricity, to KEPCO's annual average costs for supplying all consumers within the tariff classification suffers from the same flaws. *See* Pl. Br. 18-19.

"due allowance for factors affecting comparability" when applying tier-ii methodology).  It is thus reasonable for Commerce to also take the comparability of the cost and price data into account when using its tier-iii methodology, and Commerce did so here based on the data it had available on the record.  As discussed above, Commerce has discretion in choosing how to measure the adequacy of remuneration, and the methodology chosen in this case, which ensures an apples-to-apples comparison between costs and revenues, was reasonable.

Finally, Plaintiff claims record evidence suggests that "KEPCO has structured its electricity prices to maintain subsidies to large industrial users like steel producers, while recouping losses on those sales through higher prices to other users."  Pl. Br. 24; *see also* Pl. Br. 18.  However, Plaintiff does not support this assertion, and relies on a misstatement of Commerce's analysis to support this claim.  Plaintiff provides no data to substantiate its argument, citing only to a newspaper article that does nothing more than indicate that off-peak prices are available to industrial users, *see* Pl. Br. 24 (citing Nucor's New Subsidy Allegation at 18–19, Exhibit 14, p. 4 (P.R.83-84)), which—in itself—does nothing to support Plaintiff's argument of cross-subsidization.  Off-peak prices are not limited to industrial users, *see* GOK NSA QR at Exhibit E-9 (C.R.255/P.R.121), and offering lower rates when demand is lower during overnight hours is consistent with market principles (and taking into account prevailing market conditions), not evidence of cross-subsidization.  *See POSCO*, 581 F. Supp. 3d at 1281.

Moreover, Plaintiff argues that "{b}asing the analysis on KEPCO's total revenues *on all sales to all customers* effectively launders the benefit conferred by subsidized prices by offsetting them with revenues on sales at non-subsidized prices to other consumers."  Pl. Br. 24 (emphasis added).  Commerce, however, did not compare total revenues on *all sales to all customers*; it compared revenue on all sales to *large industrial users*, i.e., the classification

Plaintiff argues is being subsidized.  *See Preliminary Results IDM* at 38 (P.R.169).  Under Plaintiff's theory, therefore, KEPCO is subsidizing industrial users by charging them the exact same tariff-based price, which is inane.  Instead, Commerce's evaluation of those broadly applicable rates based on the classification level as a whole was reasonable, and Commerce rightly found that "there is no basis to conclude that this {subsidization} is taking place."  *Final Results IDM* at 25 (P.R.198).  Plaintiff fails to establish that the evidence suggests otherwise.

In fact, the GOK has repeatedly demonstrated—and Commerce has repeatedly found based on actual cost and price data—that KEPCO's revenue on sales of electricity is sufficient to cover costs (including the cost of electricity generation) *and a return on investment* for each tariff classification.  *See Preliminary Results IDM* at 38 (P.R.169) ("We examined the above process and were able to trace the costs and the rate of return to KEPCO's submitted cost data through to its recovered costs for each tariff classification.").  And the respondents were subject to the same electricity rates as the other companies in their respective classifications.  *Final Results IDM* at 21 (P.R.198).  To the extent that the respondents paid less for electricity during particular times of the day or certain months of the year than during other periods, this court has rejected such pricing as evidence of cross-subsidization, explaining that "it would seem that setting lower rates for lower demand during off-peak hours is consistent with market principles rather than being a hallmark of 'de facto cross-subsidization.'"  *POSCO*, 581 F. Supp. 3d at 1281.  Moreover, Plaintiff's theory that KEPCO sells at a loss to "large industrial users" while recouping those losses through sales to other customers is contradicted by the fact that KEPCO's

[

].  GOK NSA QR at 20 (C.R.252/P.R.121), Exhibit E-9 (C.R.255/P.R.121), Exhibit E-17 (C.R.256-258/P.R.121).  As such, record evidence directly contradicts Plaintiff's theory of cross-subsidization for the largest industrial users.

Notwithstanding Plaintiff's assertions to the contrary, record evidence demonstrates that the prices charged by KEPCO were above reported costs of supply for the tariff classes and were sufficient to cover costs (including the cost of electricity generation) plus a return on investment. Therefore, substantial evidence supports Commerce's conclusion, and Plaintiff's arguments are without merit.

## <u>CONCLUSION</u>

For the reasons discussed above, the challenged aspects of Commerce's *Final Results* are supported by substantial evidence and in accordance with law.  The Court therefore should sustain Commerce's decisions therein.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Sarah S. Sprinkle
Daniel M. Witkowski
Devin S. Sikes
Sydney L. Stringer
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
Dated: December 15, 2022          *Counsel for the Government of the Republic of Korea*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Akin Gump Strauss Hauer & Feld LLP hereby certify that

forgoing Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record,

dated December 15, 2022, complies with the word-count limitation set forth in the Court's

Chambers Procedures 2(B)(1).  The memorandum of law contains **10,212** words according to the

word-count function of the word-processing software used to prepare the memorandum.


Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Sarah S. Sprinkle
Daniel M. Witkowski
Devin S. Sikes
Sydney L. Stringer
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: December 15, 2022          *Counsel for the Government of the Republic of Korea*

1